EL PUEBLO, DEMANDANTE Y APELADO, *v.* FAJARDO, ACUSADO Y APELANTE.

APELACIONES procedentes de la Corte de Distrito de Mayagüez en causas por infracción de la Ley de Rentas Internas.

Nos. 833, 850, 852.—Resueltos en mayo 29, 1916.

SOBRESEIMIENTO DEL PROCESO.—ACUSACIÓN FUERA DE TÉRMINO—NON-SUIT—RECONSIDERACIÓN DE RESOLUCIÓN—AFFIDAVITS DE MÉRITOS—APELACIÓN.—Cuando un acusado una vez desestimada una moción de sobreseimiento de la acusación por no haber sido presentada ésta dentro del término legal conforme al inciso 1º. del artículo 448 del Código de Enjuiciamiento Criminal, y al pedir, una vez oída la prueba de cargo, el sobreseimiento (*non-suit*), no solicita la reconsideración de la resolución de su anterior moción, ni llama la atención de la corte acerca de la verdadera cuestión basada en la discrepancia que exista entre los hechos según se expresaron en los *affidavits* del Fiscal y tal como aparecieron de la prueba practicada en el juicio, no puede plantearse por primera vez dicha cuestión en apelación.

LEY DEL CASO—CUESTIONES LEGALES ENVUELTAS—RESOLUCIÓN EN APELACIÓN—DEBER DE LA CORTE SENTENCIADORA.—Cuando se ha resuelto en primera apelación por el Tribunal Supremo la cuestión legal envuelta, es deber de la corte sentenciadora aplicar la ley en la forma enunciada a los hechos establecidos por la prueba presentada en el juicio, prescindiendo de, pero sin que necesariamente renuncie a, cualquier opinión particular que pudiera tener en cuanto a la corrección de la doctrina establecida.

INFRACCIÓN LEYES RENTAS INTERNAS—TRAMA, INSTIGACIÓN, ALICIENTE O INVITACIÓN—CONNIVENCIA—AGENTE DE RENTAS INTERNAS.—No existe trama, instigación, aliciente o invitación por parte del Gobierno o de cualquiera de sus agentes cuando, como en este caso, un agente de rentas internas, simula de acuerdo con instrucciones superiores, aceptar las proposiciones que una persona por su propia iniciativa le sugiere y propone repetidas veces para en connivencia extraer alcohol de una destilería sin cumplir con la ley.

ID.—PRUEBAS—MEDIOS DE OBTENERLAS.—El proporcionar la oportunidad que se desea, solicita o que es necesaria y el facilitar la comisión de un delito ideado,

concebido y en realidad consumado por el acusado, se ha considerado por las cortes que es un medio razonable y legítimo de obtener prueba para la acusación y convicción del mismo.

Id.—Extracción de Alcoholes—Falta de Pago de Derechos.—El delito que castigan las secciones 3 y 6 de la Ley enmendando el Capítulo II del Título IX del Código Político de marzo 9, 1905, según fué enmendada por leyes de marzo 9, 1911, y marzo 13, 1913, no consiste en la separación ilegal de los candados del almacén y tanques de la destilería, sino en dejar de pagar los derechos sobre líquidos espirituosos destilados antes de que dichos espíritus alcohólicos salgan de la fábrica.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. Willis Sweet*.

Abogados del apelado: *Sres. Howard L. Kern, Attorney General; R. W. Perkins, Jr., Attorney General Auxiliar; y Jaime Sifre, Jr., Fiscal Especial General*.

El Juez Asociado Sr. Hutchison, emitió la opinión del tribunal.

El acusado y apelante fué declarado culpable en tres casos por infringir la Ley de Rentas Internas. Las acusaciones, excepto en lo que hacen referencia a las diferentes fechas en que se alega fueron cometidos los respectivos delitos y a otros detalles de menos importancia, las principales cuestiones de ley y el carácter general y efecto de la prueba, son prácticamente iguales en los tres casos. El apelante solicitó y obtuvo permiso para presentar un solo alegato, comprensivo de toda la cuestión, habiendo observado el apelado el mismo plan, haciendo además una relación y argumentación adicional respecto a ciertos hechos que aparecen en un caso y no en el otro. También presentó el apelante dos alegatos de contestación. Las tres apelaciones pueden ser resueltas en una sola opinión.

La historia de estos casos, como ha sido considerada y descrita por el apelante, es la siguiente:

"El 24 de septiembre, 1914, se celebró un juicio contra el acusado sobre acta de acusación en que se le acusaba de haber extraído alcohol sin satisfacer las rentas internas correspondientes.

"En un principio se presentaron cuatro acusaciones contra el acusado, idénticas en su lenguaje, y envolviendo el mismo delito, con

la sola excepción de consignarse distintas fechas en la comisión del delito, y designándoles bajo números diferentes.

"El primer juicio celebrado resultó en una absolución del acusado. En este caso toda la prueba de la acusación hubo sido aducida, y al anunciar al ministerio fiscal que el Estado había terminado su prueba, el abogado del acusado presentó una moción solicitando el sobreseimiento.

"La moción de sobreseimiento fué extensamente discutida por los letrados de ambas partes. La corte se reservó estudiar la cuestión, y el día siguiente dictó su fallo y opinión, según cuyos términos el acusado quedó absuelto, y relevados de responsabilidad los fiadores.

"Se hace referencia a este caso y al resultado del juicio, por razón de que el acusado se funda en los procedimientos habidos en el mismo y en el fallo para sostener que en cada una de las acusaciones subsiguientes, en número de tres, la corte dictó su fallo privándole de su libertad sin el debido proceso de ley, todo lo cual se hizo en violación de las leyes de los Estados Unidos y de Puerto Rico.

"Copias de aquellos procedimientos habidos en dicho primer juicio que pueden considerarse aplicables al caso presente, han sido acompañados a este *brief* en forma de apéndice.

"Contra este fallo de la corte de distrito el Estado interpuso recurso de apelación para ante esta Honorable Corte Suprema.

"En el entretanto el ministerio fiscal hubo ofrecido una enmienda a la segunda acusación, sobre la cual había de ser más tarde juzgado el acusado. A esta acusación se agregaron, e hicieron parte de la misma, las varias reglas y reglamentos del departamento del tesoro para el gobierno de los agentes de rentas internas, y otros detalles para regular el cobro de las rentas internas de la isla.

"El acusado, por conducto de su abogado, solicitó la eliminación de algunos extremos de la acusación enmendada presentada, pero la corte denegó las objeciones y sobreseyó la acusación a moción espontánea, ordenando el archivo de la causa. La orden de sobreseimiento se basó en la opinión dada sobre el caso No. 733, en cuya causa el acusado fué absuelto. La aludida opinión se halla anexa a este *brief* en la forma de *exhibit,* juntamente con la orden de sobreseimiento, también en la forma de *exhibit.*

"El Estado entonces apeló de la orden sobreseyendo la causa No. 833, causa que se halla pendiente ante esta honorable corte a virtud de recurso establecido por el acusado.

"Había, pues, pendiente ante esta honorable corte la apelación por el Estado en el caso No. 733, causa que fué juzgada y en la que

el acusado fué absuelto. En esta apelación el Estado trajo a esta corte solamente las alegaciones y la opinión y fallo absolutorio.

"También había pendiente ante esta corte al mismo tiempo la apelación del Estado en el caso No. 833, causa que fué sobreseída por la corte de distrito a moción espontánea, sin juicio, habiéndose basado el sobreseimiento en la opinión y, por supuesto, el récord en la causa No. 733.

"En este estado las cosas, el acusado, por conducto de su abogado, solicitó la acumulación de las dos apelaciones, se le permitiese presentar un solo *brief,* y una providencia de esta corte al apelante, el Estado, disponiendo trajese a la corte el récord, y una relación o *statement* del caso sobre el cual la primera causa fué absuelta, y la segunda sobreseída.

"Estando pendiente esta moción, el letrado en representación del Estado solicitó la desestimación de la primera apelación, es decir, la apelación en la causa No. 733, y la misma fué desestimada sin notificación al abogado del acusado.

"De ahí que cuando se llamó para vista la moción solicitando la acumulación y que se ordenase fuese traído a esta corte el récord del inferior, no pudo declararse ninguna acumulación, ya que sólo quedaba a la corte una apelación por resolver.

"La moción solicitando la acumulación y que se trajese a la corte el récord, fué desestimada en el momento de la vista fijada para la misma, pero la cuestión de jurisdicción fué reservada para la vista final en la causa ahora ante esta corte en la segunda apelación, esta vez por parte del acusado, y bajo el No. 833, reservándose la corte determinar la cuestión de jurisdicción.

"En la vista final la alegación del acusado en contra de la cuestión de la jurisdicción de esta corte fué denegada, y el caso fué devuelto a la corte inferior para acción ulterior que no fuese contraria a la opinión de la Corte Suprema.

"La causa fué juzgada en la corte inferior, después de devolverse cumplimentada la orden o mandato de esta corte, y los procedimientos habidos, los testigos presentados, y la prueba aducida fueron idénticos a los del primer juicio celebrado, y el que terminó con la absolución del acusado.

"Siguiendo exactamente los procedimientos habidos en el primer caso, el acusado presentó una moción de *non-suit* o sobreseimiento al terminar su prueba la acusación, precisamente en la misma forma que se presentó la moción en el primer juicio sobre la acusación antedicha.

"No hay duda alguna que la moción ha debido ser declarada con lugar por la corte de distrito, como tampoco hay duda de que la tal moción habría sido concedida a no haber sido por la opinión de esta honorable corte, la que, según la opinión de la corte sentenciadora, previene en efecto a dicha corte el que declare al acusado culpable.

"Es este defecto extraordinario en este caso, el que, respetuosamente, sometemos a la honorable corte, tiene un alcance tal que ha privado al acusado, apelante ahora, de su libertad sin el debido procedimiento de ley.    Para la mejor comprensión de este punto, llamamos la atención a la referida opinión de esta honorable corte, la que se halla anexa al récord de la causa No. 33, y a la cual habremos de referirnos.

"Habremos de tener presente que en la vista ante esta honorable corte, la representación del acusado insistió en que el propósito del apelante entonces era obtener una opinión de esta corte, en anticipación a la celebración de los otros juicios pendientes en la corte de distrito, que predominara en la resolución del inferior, más bien que resolver (*to test*) la cuestión de si los hechos consignados en la acusación constituían un delito, y si el juez erró al sobreseer la misma. Y recordaremos también, porque, en la misma forma que la manifestación anterior, se hace alusión a ello en la opinión de esta honorable corte, que la representación del acusado admitió que la acusación contenía hechos bastantes para constituir una causa de acción; y que a menos que esta corte desestimase la apelación fundándose en que no tenía jurisdicción, el caso tenía que ser devuelto a la corte de distrito para la celebración del juicio.

"No es nuestro objeto ocuparnos del propósito de esta honorable corte, o del de la honorable corte de distrito.    Hemos de ocuparnos estrictamente de los hechos, en la forma como aparecen del récord, y su resultado.    En la acción de la corte de distrito predominó la opinión de esta honorable corte, la que llevó a aquel tribunal a revocar su fallo anterior, precisamente en la forma que teníamos anticipado había de conducirse dicho tribunal en el caso ·de que el apelante obtuviese una resolución que la corte inferior pudiese interpretar como significativa de la opinión de esta honorable corte y sobre los méritos de este caso.

"Solamente habremos de agregar que el apelante compareció ante esta honorable corte con un *brief* proponiéndose discutir los hechos en el caso, y la aplicación de la ley a los mismos, a pesar de no haberse notificado al acusado o su abogado una relación del caso o récord alguno de cualquier carácter que fuere, ni traído a esta hono-

rable corte una sola palabra de la prueba aducida y presentada en el juicio; y no obstante la corte inferior declaró que su decisión había sido revocada, y que en efecto se la había instruído hallar al acusado culpable independientemente de los hechos en la causa.

"Y la corte inferior así lo hizo, como aparece consignado en su opinión.

"Habiendo la corte de distrito negado la moción de *non-suit*, el acusado presentó prueba; la que, independiente de su valor probatorio, era superflua." * * *

Aparte de la referencia que se hace de los hechos discutidos en un alegato presentado por el Gobierno en la anterior apelación, que fueron los que se alegaron en la acusación enmendada mencionada en primer término, y prescindiendo de la alegación en cuanto a los hechos probados en el juicio del caso en el cual fué absuelto el acusado, de los cuales nada sabemos que no sea por lo que consta del contenido del alegato del apelante y de una opinión y resolución de la corte de distrito que fué discutida y resuelta en la opinión de este tribunal sobre dicha anterior apelación; si eliminamos en primer lugar la mera alegación de que la moción de sobreseimiento de la causa (*non-suit*) "debió haber sido concedida por la corte de distrito" y la idea en que más bien se persiste de haber estado "gobernado" el juez sentenciador por la anterior opinión de este tribunal, en ambas de cuyas suposiciones se da por sentada la cuestión vital que aquí se discute, y enmendamos entonces la teoría relativa al sobreseimiento y archivo de la causa por la corte de distrito con anterioridad a dicha primera apelación y del fundamento de la resolución que entonces fué apelada, para ajustarla a la sentencia dictada en esa apelación, la exposición del caso como ha sido presentada por el apelante es razonablemente correcta.

Tanto la acusación original como la enmendada en uno de estos casos, la actitud e informe del apelante con motivo de la primera apelación, la resolución de la corte sentenciadora dejando sin efecto la acusación enmendada, la opinión del juez de la corte inferior emitida en el caso celebrado y sobreseído anteriormente a que se hace referencia en la refe-

rida resolución y que forma parte de la misma, los artículos que son pertinentes de la ley de contribuciones y de los Reglamentos de Tesorería, todo ha sido expresado en el caso de *El Pueblo* v. *Fajardo,* 21 D. P. R. 451, al cual nos referimos sin hacer una repetición innecesaria, para que pueda tenerse una información completa en cuanto al particular.

Los señalamientos de error que han sido alegados son los siguientes:

"1. Que el acusado, por razón de los procedimientos habidos y fallo dictado en dicha causa, ha sido privado de su libertad sin el debido procedimiento de ley.

"2. La corte erró al denegar la moción de sobreseimiento de dicha acusación fundada en que habían transcurrido más de sesenta días desde el arresto del acusado, presentación de la acusación y *arraignment* de dicho acusado, con arreglo a lo prescrito en la ley.

"3. La corte erró al desestimar la moción solicitando el sobreseimiento de la acusación y la libertad del acusado, basada en que los cargos comprendidos en el acta de acusación y que acusaban al reo de extraer alcohol sin satisfacer las rentas internas correspondientes, están incluídos y forman parte de un delito mayor de que se acusa al referido acusado, a saber: los cargos de soborno que se formulan y por cuya acusación el reo había sido arrestado y estaba pendiente de juicio, habiéndose alegado el referido soborno en conexión y como parte de la misma transacción alegada en la acusación sobre la cual se celebraba este juicio.

"4. La corte erró al denegar la moción del acusado solicitando se requiriese al ministerio fiscal eligiese entre ir a acusación sobre un acta por un delito constitutivo de *felony,* ya que las dos acusaciones alegadas forman parte de una misma transacción, y, por lo tanto, constituyen el mismo delito.

"5. La corte de distrito erró al denegar la objeción del acusado en que éste alegaba la falta de jurisdicción originaria de la corte de distrito para conocer de este caso, fundado en que, con arreglo a la Ley de Enjuiciamiento Criminal de Puerto Rico, la competencia para conocer de los casos de *misdemeanor* en primera instancia se halla investigada en las cortes municipales.

"6. La corte erró al resolver que la Corte Suprema había instruído a la corte sentenciadora, ya fuera directa o indirectamente a que encontrase al acusado culpable.

"7. La corte erró al denegar la moción de *non-suit* cuando la acusación hubo terminado su prueba.

"8. La corte erró al denegar la moción del acusado en lo que respecta a la admisión como prueba del cheque expedido por el testigo Vázquez, y marcado *Exhibit* — de la acusación.

"9. La evidencia es insuficiente para sostener el fallo.

"10. La corte erró al dictar un fallo declarando al acusado culpable.

"11. La corte erró al sentenciar al acusado por razón de dicho fallo."

Al considerar las cuestiones que así han sido promovidas seguiremos el orden indicado, en tanto sea conveniente y compatible con un resumen razonable de nuestro propio criterio respecto al caso.

En el primer señalamiento se indica sin haber discusión o cita de autoridades, que el segundo de los errores alegados trajo por consecuencia la privación del acusado de su libertad sin el debido procedimiento legal.

En la doctrina sentada en el caso de *Pennoyer* v. *Neff* y en el de *Scott* v. *McNeak* respecto a la necesidad de un tribunal competente y jurisdicción sobre la persona para que exista el debido procedimiento legal, se basa la conclusión de que "en todos los casos en que un hombre no quede convicto por una corte de competente jurisdicción, o es llevado ante la corte después de haber transcurrido un período de sesenta días después del arresto sin razón suficiente para ello y sin tener en cuenta ninguna de estas causas es sentenciado por una corte, tal persona ha sido privada de la libertad sin el debido procedimiento legal."

Y, pasando por un momento al segundo señalamiento, encontramos una débil luz lateral en lo siguiente: "Afirmamos que la corte perdió jurisdicción para proceder, puesto que no se presentó suficiente justificación. En lo que respecta al principio general citamos las siguientes autoridades: *People* v. *Wickham,* 113 Cal. 283; *People* v. *Buckley,* 116 Cal. 146; *People* v. *Begerson,* 11 L. R. A. 573 y casos citados."

La referencia a que se ha hecho mención últimamente es

claramente una cita equivocada. Los otros dos casos hablan por sí mismos y pueden quedar como han sido sometidos por el apelante, o sea, sin cita o comentario. No solamente este aspecto de la cuestión relativa al debido procedimiento se presenta así en una forma más o menos atenuada, sino que el apelante, para hacer constar la proposición de algún modo, admite por deducción necesaria que si la corte no incurrió en error, como se alega en el segundo señalamiento, entonces queda eliminada toda cuestión de jurisdicción y, por tanto, de debido procedimiento legal. La cuestión, por consiguiente, no requiere mayor consideración a menos que pueda ser sostenida la proposición enunciada en el segundo señalamiento.

Tanto la jurisdicción de la corte sentenciadora como la de este tribunal también ha sido impugnada ''por el fundamento de que habiendo la corte inferior ordenado la absolución del acusado, ni esta corte ni la corte inferior tienen ya jurisdicción sobre el asunto.'' Habiendo sido resuelta la cuestión en sentido adverso para el apelante en este caso, o sea el apelado en la anterior apelación, no se discute ahora nuevamente el punto, sino que meramente se reserva ''porque un juicio sin jurisdicción y convicción de acuerdo con ésta, priva al acusado de su libertad sin el debido procedimiento legal.''

La única proposición en la cual se insistió en la vista por equivaler a una falta del debido procedimiento legal, es que ''la corte de distrito, creyendo que había recibido de la Corte Suprema instrucciones para declarar culpable al acusado, aun cuando no se había celebrado ningún juicio, hizo abandono de su responsabilidad en este caso y de hecho afirma que su fallo descansa en una orden de la Corte Suprema y no en los hechos presentados a la consideración del tribunal.'' Y también en cuanto a esto sólo necesitamos precisar si es o nó correcta la premisa. Desde luego que esto habrá de depender de si en realidad la corte de distrito resolvió o no como se alega en el sexto señalamiento.

Toda la discusión que se hace en el segundo señalamiento va dirigida a los méritos de los hechos como han sido presen-

tados por el Fiscal en oposición a la moción de sobreseimiento. Las razones alegadas por el Fiscal en su esfuerzo por justificar la demora, aparecen expresadas en cada caso en tres declaraciones juradas (*affidavits*), a saber:

"Yo, Angel Acosta Quintero, mayor de edad, casado, vecino de Mayagüez, Fiscal del Distrito Judicial de Mayagüez, bajo juramento declaro y digo:

"Que en 7 de marzo de 1914, arresté por virtud de declaraciones juradas del investigador de Rentas Internas de Puerto Rico, Félix Vázquez, al vecino de Mayagüez, Mateo Fajardo Cardona, por resultar de dichas declaraciones juradas, causa probable para su detención, como responsable de tres delitos contra 'El Poder Ejecutivo' (*felonies*), y por cuatro delitos de 'Infracción a las Leyes de Rentas Internas de Puerto Rico' (*misdemeanors*).

"Que en dicho mes de marzo de 1914, estuve ocupado, además de la labor diaria de la Fiscalía, en las investigaciones criminales de casos graves de asesinato, y en el despacho de asuntos civiles que requieren la intervención del Fiscal, y en el trabajo asiduo de vistas de casos criminales, y preparación de evidencia ante la corte y el jurado, pues en dicho mes de marzo estuvo la corte ocupada en la resolución de asuntos criminales de *misdemeanors* y *felonies*, celebrándose la vista de casos tan importantes y complicados como los de 'Mutilación,' contra Alfredo Bravo, y el de 'Abuso de Confianza,' contra Salvador Fulladosa y Souffront, y otros más, habiéndose tenido que suspender la vista del caso contra Juan Rivera Vélez, por 'Asesinato,' y el de Antonio Montalvo, por el mismo delito, por enfermedad del Fiscal que suscribe, motivada dicha enfermedad por el exceso de trabajo que tuvo en dicho mes. Esa suspensión fué acordada en 28 de marzo último.

"En los primeros días del mes de abril de 1914, volvió el Fiscal que suscribe, a reanudar sus trabajos en la Fiscalía, y durante ese mes ocupóse en obtener la evidencia suficiente para poder acusar en los casos de 'soborno' y los de infracción de rentas internas, contra Mateo Fajardo, y en preparar la evidencia de los demás casos criminales en tramitación en la Fiscalía, así como atender a la investigación de hechos criminales ocurridos en el distrito, e investigaciones especiales, remitídale por el Hon. Attorney General, no siendo posible obtener en dicho mes y por sus muchas complicaciones suficiente evidencia para acusar en los casos de infracción a las Leyes de Rentas Internas, contra Mateo Fajardo, y sí obteniéndose buena y suficiente

evidencia, más allá de toda duda racional, para los casos de 'soborno,' contra el expresado Mateo Fajardo.

''En el mes de mayo de 1914, y día cuatro del mismo, juré y dejé presentadas en la secretaría de esta corte de distrito, tres acusaciones por *felonies* de 'soborno' contra Mateo Fajardo Cardona, como un resultado de la obtención de suficiente evidencia para acusar. En dicho mes de mayo el Fiscal que suscribe, además del trabajo de la Fiscalía, tuvo que atender a la vista de casos criminales señalados para ante el tribunal de derecho y el jurado, que ocuparon la atención de esta corte en gran parte de dicho mes de mayo y en cuyo mes de mayo, fueron resueltos por el jurado casos tan importantes como los de asesinato seguidos contra los acusados Juan Rivera Vélez, Antonio Montalvo, y Felipe Antonio Casiano. El trabajo en dicho mes fué igualmente rudo y excesivo por ser el último término de la corte en el año fiscal de 1913, al 1914, pues la corte entraba en vacaciones.

''Los meses de junio y julio de 1914, y en los que esta corte estuvo en vacaciones, el Fiscal que suscribe atendió a la evidencia de los casos de *misdemeanors* por infracción a las Leyes de Rentas Internas, cometidos por Mateo Fajardo y consistentes en extraer y permitir extraer alcohol de su destilería 'Eureka' sita en Hormigueros, y para la obtención de dicha evidencia, el Fiscal que suscribe tuvo que trasladarse a distintos pueblos de este distrito judicial, y a la ciudad de San Juan, en distintas ocasiones, pues el caso por la importancia en sí del mismo y cuantía de las defraudaciones, que afectan y han afectado en sumo grado al montante calculado por 'El Pueblo de Puerto Rico' en sus ingresos por contribución de rentas internas, exigió una cuidadosa, minuciosa y especial investigación, siendo este delito de los que más alarmaron a la opinión pública, por lo que ha afectado al Tesoro de Puerto Rico, y estando conectada la investigación del Fiscal que suscribe, con la que con el mismo fin practicaba el Departamento de Tesorería de Puerto Rico y el Fiscal Jaime Sifre, Jr., investigaciones que han exigido el empleo de detectives, registros de libros de contabilidad de corporaciones y compañías, examen de cuentas en los libros de la Tesorería y colecturías y en la obtención de declaraciones juradas de personas residentes en distintos pueblos y ciudades de la Isla.

''Que el Fiscal que suscribe tuvo asimismo que trasladarse en el mes de junio próximo pasado a la ciudad de Guayama para atender en la corte de distrito, de dicho Distrito Judicial de Guayama, a la vista de casos criminales ante aquella corte y por ante el tribunal de derecho y jurados, por hallarse ausente y en licencia el Fiscal propietario de

aquella corte de distrito, Santiago Vivaldi Pacheco, y en cuya ciudad de Guayama permaneció varios días.

"Que el trabajo de investigación para suficiente evidencia que permitiera acusar en los delitos de *misdemeanors* de infracción a las Leyes de Rentas Internas, seguidos contra Mateo Fajardo Cardona y por los que fué detenido allá en 7 de marzo del corriente año vino a quedar terminado en los primeros días del corriente mes y año en los que el Fiscal que suscribe y allá en 11 de agosto último corriente año, ha podido suscribir y presentar como ha suscrito, jurado y presentado cuatro acusaciones por infracción a las Leyes de Rentas Internas de Puerto Rico, y por cuyos hechos había sido detenido y prestado fianza para permanecer en libertad el expresado Mateo Fajardo Cardona.

"Que toda esa investigación ha sido, es y fué necesaria e indispensable, para poder presentar a la corte los casos con todos los detalles de una buena evidencia directa y circunstancial que permita sostener acusaciones contra un acusado más allá de toda duda razonable.

"Que el Fiscal que suscribe ha estado durante todo ese lapso de tiempo con atención constante a dichos casos y a las investigaciones que por orden suya se practicaban en esta ciudad y su distrito judicial, así como a las que se practicaron en la Isla por el Fiscal Sifre y los agentes de la Tesorería de Puerto Rico, y que dichos trabajos han requerido tiempo, dada su importancia y trascendencia y que no ha habido en el mismo negligencia, ni dilación, ni ha podido hacerse racionalmente en menos tiempo."

"Yo, Zenón Ortiz, P. I., Placa No. 36, mayor de edad, casado, vecino de Mayagüez, bajo juramento declaro y digo:

"Que allá por el mes de marzo de 1914, el Fiscal del Distrito Judicial de Mayagüez, Lcdo. Angel Acosta Quintero, me dió una comisión especial para investigar la extracción de alcoholes sin pagar los derechos correspondientes de Rentas Internas de Puerto Rico, y de cuyos delitos se acusaba al vecino de Mayagüez, Mateo Fajardo Cardona, y por cuyos delitos fué éste detenido y prestado fianza para permanecer en libertad.

"Que mi trabajo consistía en averiguar y obtener la evidencia de las extracciones de los alcoholes destilados en la destilería 'Eureka' del dicho Mateo Fajardo Cardona, en carros, y relacionados con los carreteros que llevaron a cabo dichas conducciones. Que este trabajo me ha requerido la inversión de un tiempo asiduo de días y en los que he estado ocupado en Mayagüez, Hormigueros, Cabo Rojo, San

Germán, y otros pueblos del distrito, y cuyas investigaciones y datos he ido poniendo en conocimiento del Hon. Fiscal, Sr. Acosta Quintero.

"Que este trabajo vine a concluirle allá a fines del mes de julio próximo pasado, y de los que impuse detenidamente al Fiscal Sr. Acosta Quintero en los primeros días del mes de agosto.

"Que no ha habido demora en este trabajo y el que para el mejor éxito del mismo practicaba al objeto de no infundir sospechas prestando mis servicios como tal policía en Mayagüez, y el que no he podido hacer en menos tiempo del expuesto, sin que en el mismo haya tenido negligencia, demora ni dilaciones."

"Yo, Jaime Sifre, Jr., mayor de edad, vecino de San Juan, bajo juramento declaro y digo:

"Que desde el mes de marzo de 1914, y por orden superior vengo practicando una investigación no tan sólo en el distrito de Mayagüez, sino en toda la Isla, y en relación entre otras cosas, con ciertas infracciones de la Ley de Rentas Internas que sostiene 'El Pueblo de Puerto Rico,' fueron cometidas por el Sr. Mateo Fajardo Cardona, sacando alcohol de su destilería, sin haber pagado el impuesto que determina la ley, infracciones que son de gran importancia por su cuantía.

"Que esta investigación fué difícil y laboriosa por cuanto se hizo preciso investigar el paradero del alcohol que se sostiene haber sido extraído ilegalmente, y para llegar a ese fin, fué necesario el examinar con toda clase de detalles, los libros de varias corporaciones y compañías, y todo este trabajo se vino a terminar en los primeros días de este mes de agosto de 1914.

"Uno de los objetos de esta investigación, fué el conseguir cierta prueba para robustecer la que tenía el Fiscal de este distrito, como causa probable, para la detención del acusado Mateo Fajardo Cardona, por infracciones a la Ley de Rentas Internas. Que esta prueba era indispensable para poder presentar a la corte con toda clase de datos las acusaciones correspondientes. Que no hubo demora alguna y que el trabajo no ha podido hacerse en menos tiempo atendiendo a su importancia, distintos pueblos y ciudades que ha habido que visitar y en general a la magnitud del asunto en sí."

Los hechos desarrollados en los juicios son señaladamente pocos y sencillos. En verdad que toda la prueba de la acusación en la forma narrativa en que consta en los autos, incluyendo las objeciones, órdenes, excepciones, manifestaciones y admisiones hechas por los abogados, y todo el examen de repreguntas, por lo menos en un caso, el No. 833, todavía

es menos voluminosa que el contenido de las declaraciones juradas que acabamos de citar. Aparece que en diciembre de 1913, o enero de 1914, con motivo de sospechas de que se estaban cometiendo fraudes, un agente de Rentas Internas llamado Vázquez fué enviado a Mayagüez, a hacerse cargo de aquel distrito y con el objeto de investigar la situación. Poco tiempo después de su llegada se le acercó en varias ocasiones el Sr. Mateo Fajardo quien le presentó la cuestión de evitar el pago de los derechos en los alcoholes, le describió el método que él había seguido en connivencia con los agentes anteriores, y ofreció hacer negocio en la misma forma con Vázquez, siendo su proposición la de pagar al agente el 40 por ciento de la suma debida al Gobierno sobre todo alcohol extraído sin hacer el pago de los derechos. Vázquez vino a San Juan, dió cuenta de esto y recibió instrucciones del Attorney General y del Departamento de Tesorería de aceptar la proposición para dejar que Fajardo sacara el alcohol que quisiera en la forma por él sugerida, tomar el dinero y obtener cualquier otra prueba que fuere posible. El agente volvió a Mayagüez y luego iba a la destilería siempre que se lo pedía Fajardo, quitaba los candados del almacén y del tanque y permitía a Fajardo, o a sus agentes y empleados, extraer en cada ocasión una cantidad de alcohol sobre la cual había sido satisfecho el impuesto debidamente y además de esto una cantidad que había sido fijada anteriormente por el acusado sobre la cual no se pagaba derecho alguno. Vázquez a la vez cumpliendo con las instrucciones recibidas en San Juan, depositó en un banco de la ciudad el dinero que le fué pagado por el acusado en cada caso, expidió cheques a favor del Tesorero de Puerto Rico por dicha suma y se los entregó al Tesorero. Estos cheques fueron retenidos sin endoso o presentación de pago y. usados como prueba en el juicio.

En el caso No. 852, en febrero 14, extrajo el acusado unos quinientos cincuenta litros de alcohol sin pagar sus derechos; en el No. 850, en febrero 18, otros 550 litros más o menos fueron extraídos en igual forma; y en el No. 833, en febrero

21, fué otra vez defraudado el Gobierno en los derechos debidos sobre unos cuatrocientos litros.

El apelante insiste muy naturalmente en el hecho de que, según aparece de los autos, ninguna de las pruebas de la clase que se dice fueron obtenidas durante el período de la demora fué utilizada; que los autos demuestran positivamente que cualquier prueba por insignificante que fuere que hubiera tenido el Fiscal en los casos de *misdemeanor,* estaba en poder del mismo, o podía ser presentada por él inmediatamente cuando fueron expedidos los mandamientos de arresto; que hubo un Fiscal especial en la contienda para ayudar a preparar estos casos; y que el abogado del Gobierno se basó simplemente en el ejercicio de discreción por parte de la corte rayana en indulgencia y abuso de dicha discreción.

Olvida el apelante que la corte de distrito en la fecha de su resolución no había oído la más mínima prueba en ninguno de estos casos. No sabía, ni pudo haber sabido entonces lo que ahora aparece de los autos respecto a qué prueba tenía el Fiscal en la fecha del arresto, y si era mucha o poca la prueba adicional que fué luego descubierta antes de presentar la acusación.

En cuestiones como ésta la corte, por necesidad, tiene que confiar en gran parte, sino absolutamente, en las manifestaciones del Fiscal y jamás debe sentirse obligada a explorar la conciencia, o dudar de la veracidad de ese funcionario de la corte. Y parece deducirse de aquí, que el Fiscal, que solamente tiene conocimiento de los hechos no debe jamás olvidar por un momento la seriedad de la responsabilidad moral que de tal modo se ha reposado en él y debe evitar de la manera más escrupulosa posible, la posibilidad de que la corte pueda ser inducida a error en algún sentido por cualquier omisión inadvertida, y respetar y hacerse acreedor a la confianza reposada en él.

No queremos decir que los funcionarios del Gobierno en este caso fueran culpables de alguna mala conducta deliberada, o de tener verdadera intención de despistar a la corte

sentenciadora. Por el contrario, en la forma de llevar estas cuestiones han probado ellos desde el principio un celo digno de encomio, una energía incansable y completo conocimiento práctico y capacidad en medio de una gran dificultad y de los muchos obstáculos con que han tropezado, y no abrigamos ni siquiera la más remota sospecha de algún motivo injustificado, o propósito consciente para aprovecharse de una situación que requería de ellos un grado mucho mayor de franqueza y precisión en la exposición de los hechos que el que parece que tuvieron en cuenta. Pero creemos que la verdadera naturaleza de estos casos en particular fué muy tergiversada y exagerada en los *affidavits* citados anteriormente, y que, en tanto el contenido y tenor general y efecto de aquellas manifestaciones eran bastantes para despistar a la corte, tal falta, para ser claros y francos, en tal situación, debe ser censurada por establecer un precedente que de ser tolerado pronto se convertiría en una práctica completamente perniciosa e indebida.

Posible es que si el acusado hubiera llamado la atención de la corte sentenciadora acerca de la discrepancia que existe entre los hechos según se expresaron en estos *affidavits* y los hechos como aparecieron de la prueba presentada en el juicio, y pedido la reconsideración de su anterior moción al solicitar el sobreseimiento (*non-suit*) por otros fundamentos, o quizás si solamente hubiera presentado de nuevo su moción de sobreseimiento después de ser presentada la acusación enmendada con su abundancia de detalles importantes, entonces la causa, no haciéndose constar nada más, hubiera sido sobreseída. Para los fines de esta opinión puede también admitirse que si la cuestión hubiera sido promovida de tal modo en la corte inferior y la corte sentenciadora a falta de alguna otra demostración ulterior o mejor por parte del Fiscal se hubiera negado a sobreseer, nos hubiéramos inclinado a revocar su resolución que así ha sido invocada. Sea esto como fuere, no es la intención de este tribunal estimular mediante la aprobación tácita de los métodos empleados por la

acusación en este caso o de algún otro modo favorecer lo que parece ser una desatención que va aumentando del derecho a un juicio rápido garantizado a todo acusado que de buena fe lo quiere y solicita.   Pero el acusado debe reclamar el derecho.   No puede renunciar su privilegio cuando debió haber insistido en él, para luego ser oído en queja puesto que el Fiscal y la ocupada corte sentenciadora no tenía más interés en la cuestión que el que él mismo tenía.   En el presente caso el acusado, una vez que su moción original fué desestimada, u olvidó enteramente, al parecer, o abandonó por completo la única verdadera cuestión que fué promovida por él, y no habiéndosele dado oportunidad a la corte sentenciadora para considerar dicha cuestión en el sentido en que ahora se pretende someter, no podemos considerar los méritos de la alegación hecha por el apelante por primera vez en apelación.

De ser considerados solos por el valor que representan tener según su faz, estos *affidavits* son formidables.   En verdad que de ser considerados así son bastantes para hacer que el juez sentenciador se sorprenda de cómo dentro de las circunstancias, los dos Fiscales mediante sus esfuerzos combinados pudieron presentar acusaciones aun dentro de los seis meses siguientes al arresto del acusado.   Las manifestaciones hechas en los mismos no fueron impugnadas ni contradichas por nada ante el juez sentenciador al tiempo de dictar su resolución sobre la moción.   Ni los mandamientos de arresto copiados en la moción de sobreseimiento, ni las acusaciones originales, ni ningún otro documento archivado entonces, determinaba la cantidad de alcohol extraído en ninguno de los casos, ni siquiera indicaban que el Gobierno tenía conocimiento acerca de tal cantidad.   La corte no tenía dato alguno en absoluto en que basar la conclusión que no fuera en las solemnes manifestaciones en las cuales tan encarecidamente se insistió bajo juramento por el Fiscal.   La acusación enmendada con sus más claros detalles no fué pre-

sentada hasta mucho tiempo después.   No es preciso discutir los *affidavits.*   Considerando toda la cuestión como fué sometida al juez sentenciador, no podemos decir que dicho juez cometió error al denegar la moción.

El apelante presenta el tercero y cuarto señalamiento como sigue:

"*Tercer señalamiento de error.*—Nuestra excepción está basada en los hechos puestos de manifiesto en este proceso en diferentes momentos del mismo.   El récord demuestra (R. 833 p. 16) que había tres acusaciones de soborno pendientes contra el acusado.   Las acusaciones de soborno estaban relacionadas con actos que figuraban en los *misdemeanors.*   Quiere decir, que el acusado sobornó al agente (una acusación), para que sacara alcohol sin pagar los derechos de rentas (otra acusación).   Se trata de una sola operación, siendo el primer cargo *felony,* y el segundo *misdemeanor.*

"Si fracasaba la acusación de *misdemeanor,* podía continuar el Fiscal con la acusación por soborno.   Pero si el delito mayor, que en este caso indudablemente incluía el segundo, fracasaba, entonces la acusación no tenía nada más que hacer.   Procediendo como lo hizo la corte desestimando la moción del acusado, éste quedaba ilegalmente detenido por un cargo o por el otro, y conforme a la regla ordenada por la corte, el acusado quedaba dos veces juzgado por el mismo delito público.

"*Ex parte Lange,* 18 Wall 163.

"*Cuarto señalamiento de error.*—Lo que discutimos con referencia a este señalamiento es esencialmente el complemento del señalamiento precedente.   Tiene que sostenerse o caer por las mismas causas, a saber: Declarado convicto o no por medio de un fallo en el *misdemeanor,* El Pueblo de Puerto Rico puede continuar con la acusación por soborno.   Pero si fracasa la acusación de *felony* tiene que caer también la de *misdemeanor.*   Por lo tanto, la acusación debe haberse haberse dirigido a elegir qué cargo debía tenerse en cuenta para la acusación."

El caso citado no es de aplicación y la alegación carece de méritos.

Con referencia al quinto señalamiento, dice el apelante:

"*Quinto señalamiento de error.*—El error indicado en este señalamiento ha sido ya resuelto por esta corte en otros casos; así, pues, lo señalamos sólo con el fin de dejar este punto en pie.   Creemos que

va incluído en el de 'debido procedimiento legal' y el de error en la aplicación de la ley.''

No habiéndose sugerido razón alguna para la reconsideración, no es necesario examinar los casos a los cuales se ha hecho referencia como decisivos de la cuestión.

Los señalamientos sexto y séptimo se fundan en una consideración mayor de la cuestión principal del alegato del apelante en la primera apelación; e insiste encarecidamente el apelante, en que a pesar de los grandes esfuerzos del abogado por hacer ver a la corte inferior cuál era el verdadero significado y alcance limitado de la opinión anterior de este tribunal, y no obstante las grandes precauciones tomadas por nosotros contra un mal entendimiento que expresamente se consignaron en la misma, sin embargo esta idea dominante del argumento en la primera vista, la profecía de que ''Estaría influída'' la corte de distrito por la opinión de este tribunal, se ha convertido, como pronosticó el acusado que se convertiría, en una dura realidad, una condición y no una teoría, un hecho acabado.

Mediante una interpretación algo forzada del lenguaje empleado en las resoluciones desestimando las mociones de sobreseimiento, el apelante trata de demostrar que la corte sentenciadora al declarar que la cuestión legal envuelta había sido resuelta por esta corte, simplemente estuvo ofuscada, eludió toda responsabilidad y en realidad no resolvió nada por su cuenta. Debe concederse que estas órdenes pudieron haber sido redactadas más felizmente pero no podemos admitir que están razonablemente sujetas a la interpretación que trata de darles el apelante.

Las dos órdenes que han sido más fuertemente atacadas por el apelante son las siguientes:

''*Juez:* La corte entiende que la cuestión legal presentada en la moción de *non-suit* ha sido resuelta por la Corte Suprema de Puerto Rico en la resolución que dictó en la apelación de la resolución de esta corte desestimando la acusación en este caso, y es el deber de la corte seguir la resolución de la Corte Suprema. La corte, por tanto,

desestima la moción de *non-suit*; y respecto a la moción para acumular, claramente el delito de *misdemeanor*, de infracción de la Ley de Rentas Internas, no hay confusión de ese delito con el delito de soborno; eso es de acuerdo todo con la jurisprudencia respecto a acumulación. La corte, por tanto, desestima también esa moción.

"*Juez:* La corte deniega esa moción. Y al desestimar la moción de *non-suit*, la corte dicta la misma resolución que dictó en el primer caso, o sea el caso número 2815; que la corte entiende que la cuestión legal presentada por la defensa, como fundamento de la moción, ha sido resuelta por la Corte Suprema en la apelación de la resolución de esta corte desestimando la acusación en aquel caso, y lo resuelve así, porque en la opinión que escribió la corte en el caso número 2815, que se agregó y se hizo parte de su resolución en el caso 2814, esta corte dijo: 'que el testimonio del agente Vázquez demostraba que él proporcionó la oportunidad al acusado para cometer el delito, que él prestó su ayuda sin la cual el delito nunca podía realizarse y lo hizo con la intención de coger al acusado *infraganti* y denunciarlo a los tribunales; el acto de consentir en abrir el depósito fué un estímulo al acusado para la comisión del fraude.' Y al final de la opinión, esta corte dijo: 'La corte afirma que cuando la comisión de un delito por una persona depende en absoluto de un acto de otra persona que es un agente de la autoridad y esta última consiente en su comisión con la intención de denunciar criminalmente a la persona, la ley no permite que el hecho así realizado sea considerado como delito público.'

"Esta opinión estuvo ante el Tribunal Supremo y fué estudiada por ese tribunal y los mismos hechos constaban claramente en la acusación enmendada que había sido desestimada por esta corte, y entonces el Tribunal Supremo resolvió que la acusación, según su faz, desde su principio hasta el fin, contradice, niega y refuta de manera clara la teoría de que el agente de rentas internas persuadió, alentó, solicitó, instigó o indujo al acusado en forma, medio o manera alguna a la comisión de cualquier acto criminal. Por eso la corte estima que la cuestión legal ha sido resuelta por el Tribunal Supremo y la corte sigue, como es su deber, su resolución."

El acusado y apelado en la anterior apelación, admitió francamente todo lo que este tribunal resolvió entonces, o sea, que la acusación enmendada en uno de estos casos expresa hechos suficientes constitutivos de delito, y no contiene nada que de ser cierto pudiera servir de excusa o justificación

de los hechos imputados, o presentara algún obstáculo legal a la causa. Al sostener este criterio, revocamos una resolución de la corte inferior. Parece razonablemente claro que dejamos de convencer enteramente a la corte de distrito en cuanto a su error, o de la corrección de nuestra propia conclusión. Eso es todo lo más que puede decirse en favor de la interpretación dada por el apelante al lenguaje de las órdenes que se alegan como erróneas.

Si la corte sentenciadora admitió como cierta la prueba del Fiscal, como lo hizo evidentemente; si consideramos la prueba a la luz de la teoría por virtud de la cual fueron juzgadas estas causas, como tenemos que hacerlo (2 R. C. L. p. 79, § 55; id. p. 183, § 156), y si desde ese punto de vista como más bien parece haber ocurrido en los presentes casos, el Fiscal meramente probó los hechos alegados en la acusación enmendada, entonces no hubo error ni incorrección en expresar como lo hizo en sustancia el juez sentenciador, que habiendo resuelto este tribunal la cuestión legal envuelta, era el deber de la corte sentenciadora aplicar la ley en la forma enunciada en la apelación anterior a los hechos establecidos por la prueba presentada en el juicio, prescindiendo pero sin que necesariamente renunciara a cualquier opinión particular y personal que pudiera tener el juez sentenciador en cuanto a la corrección de la decisión que de tal modo fué observada por él.

El argumento que se hace en el octavo señalamiento envuelve dos premisas falsas, a saber: primero, que Vázquez era un cómplice, y segundo, que el cheque presentado como prueba era para corroborar la declaración de un cómplice. Ninguna de estas suposiciones está sostenida por los autos. El cheque expedido por Vázquez a favor del Tesorero de Puerto Rico por dinero que según Vázquez fué recibido por él de Fajardo y depositado en el banco, era pertinente como circunstancia que suministraba luz respecto al motivo e intención que impulsó sus actos en los primeros períodos de estos casos y, por tanto, tendía a establecer su condición legal

como agente oficial del Gobierno, informante o policía secreto, más que la de un cómplice. "Es demasiado tarde en la historia del mundo para impugnar la veracidad de hombres, simplemente porque hagan cosas que no son populares, que nosotros desaprobamos." Y, "para concluir, las cuestiones de esta naturaleza dependen más bien del buen sentido del juez y del jurado, dentro de las distintas circunstancias de los casos, que de reglas absolutas de ley." 2 Bishop, Nuevo Enjuiciamiento Criminal, páginas 1000, 1001, secciones 1174, 1176.

Ha sido admitido expresamente, que los señalamientos décimo y undécimo son meramente formales y deben subsistir o desaparecer con los otros.

Citamos en obsequio a la brevedad la principal cuestión comprendida en el noveno señalamiento según ha sido reseñada por vía de prefacio a la extensa discusión hecha por el apelante acerca del aspecto de emboscada siempre recrudescente de estos casos.

"Considerando el caso desde el punto de vista legal resulta que éste no es el caso de una emboscada preparada por un detective. Se trata en este caso de un empleado público, que, si cuanto dice es cierto, obtuvo éxito completo en su labor de ayudar o cooperar a la realización de un hecho punible realizado por un ciudadano particular teniendo que cometer él mismo un delito para conseguir el fin deseado. La ley no permite esta acción, y lejos de eso, por conducto de sus más altos representantes en los tribunales ha condenado sin reserva alguna actos semejantes cometidos por funcionarios del Gobierno que trataron de ayudar, inducir o llevar por medio de una emboscada a ciudadanos a cometer un crimen. Nos ha sido posible encontrar un sólo caso en el cual se haya consentido tal procedimiento. El funcionario público puede ayudar a descubrir el crimen; pero no puede crearlo participando en el mismo crimen. Al pasar revista a estos casos suplicamos a la corte tenga en cuenta este importante hecho: El apelante solo no podía cometer el delito de que se le acusa. El empleado público tenía que extraer el licor, y no podía hacer esto sin la correspondiente cancelación de sellos, teniendo en cuenta que la cancelación debía hacerla el mismo empleado, puesto que todas las facultades se hallaban en sus propias manos.

"Antes .de citar autoridades oigamos de los propios labios del agente de rentas internas los motivos que le sirvieron de base para actuar en este caso. La acusación dice:

" 'Que dicha cantidad de alcohol fué allí y entonces extraída por Félix Vázquez por orden y dirección de Mateo Fajardo Cardona y obedeciendo a las instigaciones de éste.'

"Y en la misma acusación se dice que: 'el mencionado Félix Vázquez actuaba en su calidad de agente de rentas internas debidamente nombrado y con arreglo a instrucciones de sus superiores, fingiendo estar de acuerdo con la petición y proposición del acusado, y actuó en el tiempo y lugar mencionados con el fin de obtener evidencia para perseguir criminalmente al acusado por infracción de la ley que el acusado se había propuesto y deseaba violar, etcétera. (Récord págs. _____.)

"Hablando de su acción en el caso 2815 (apéndice p. ___) el testigo Vázquez fué preguntado acerca de su participación en los fraudes objeto de la acusación:

"¿Hizo usted eso de su propia voluntad?

"No, señor: de acuerdo con las instrucciones recibidas del Tesorero de Puerto Rico y del Attorney General.

"Y en el caso 850, que está pendiente ahora en esta corte, y como respuesta a la misma pregunta, el testigo dice:

" 'Que tenía instrucciones de conseguir toda la evidencia necesaria en un caso de éstos.'

"En vista de estas afirmaciones, ¿en qué se convierte en esta acusación el cargo de que el testigo procedió por solicitación y con arreglo a las órdenes del apelante?

"Lo indicado destruye la proposición de que la alegada falta, si se cometió, lo fué por otra razón distinta a ésta, a saber: Que el agente actuó con arreglo a instrucciones de sus superiores, y con el fin de ayudar o dar su cooperación al acusado como base para poderlo acusar. En otras palabras, fué ésta una de esas emboscadas oficiales que la ley ha repudiado."

Creemos que no es necesario ningún argumento para probar que el extracto aislado de la declaración de Vázquez considerado en unión de toda la prueba presentada en cualquiera de estos casos, está muy lejos de tener el efecto destructivo que se dice que tiene y en realidad no establece en absoluto ninguna distinción que pueda ser apreciada entre los hechos expresados en la acusación enmendada que

han sido admitidos por el apelante y apelado en la apelación anterior, que sea suficiente, y los hechos probados en el juicio. Por tanto, no necesitamos considerar la gran necesidad por la cual el apelante para poder distinguir los hechos referidos en dicha acusación enmendada de los hechos probados en el juicio, se ve obligado a elegir una cuestión aislada de "emboscada" en el examen de repreguntas y la contestación a ella, del récord taquigráfico del caso en que fué juzgado y absuelto primeramente, prueba que ni ahora ni nunca ha sido debidamente presentada a este tribunal. Y hasta la aparente contradicción que se pretende demostrar comparando la manifestación hecha por Vázquez en el caso No. 850, que ahora consideramos, con la parte que se cita de su declaración en el caso No. 2815, que no ha sido sometida a nuestra consideración, respecto a la naturaleza de las instrucciones que se le dieron, desaparece con una simple ojeada de la anterior pregunta y contestación a la materia objeto de la acción de la cual se hace expresa referencia en la misma pregunta hecha por el apelante.

Citamos lo siguiente del apéndice al alegato del apelante:

"P. ¿Cómo permitió Ud. que fuera sacado este alcohol de la destilería?

"R. De acuerdo con las instrucciones recibidas de la oficina del Tesorero.

"El testigo continúa diciendo: Recibí instrucciones de que permitiera que el Sr. Fajardo sacara algún alcohol sin cumplir con la ley si verdaderamente deseaba hacer esto y asegurar en este caso toda información posible para actuar en su contra.

"El Fiscal General y el Tesorero me dieron instrucciones en este sentido. Recibí las primeras instrucciones antes de extraerse el alcohol, después de haber informado sobre el asunto. Me dijeron que hiciera la extracción para obtener el dinero y entregarlo. Estas fueron las instrucciones del Tesorero y Attorney General de Puerto Rico. Subsiguientemente se me dieron otras instrucciones.

"P. ¿Hizo usted eso de su propio gusto?

"R. No, señor, de acuerdo con las instrucciones recibidas del Tesorero de Puerto Rico y del Attorney General.

"Continúa diciendo que la persona que extrae el alcohol es el dueño de la destilería y el agente de rentas internas tiene la llave. El dueño de la destilería no puede dar permiso para sacar el alcohol.

"*Nuevas preguntas del Fiscal:*

"P. ¿Usted ha dicho que después de muchas súplicas por parte del acusado informó usted a las debidas autoridades respecto a lo que él pretendía realizar?

"R. Sí, señor.

"P. Explique estas súplicas.

"R. Le ví antes del 5 en la destilería y hablando sobre este particular me dijo que había alguna probabilidad para mí de poder ganar algún dinero.

"P. ¿Habló él de este asunto una o más veces?

"R. Entonces el día 5 estaba en la destilería y me dijo que estaba listo para el negocio y preparaba la extracción para el día 9. Entonces yo acepté."

Y en cuanto a esto también el fundamento de la teoría del apelante está cimentada sobre arena. Vázquez no dejó de pagar los derechos. El no debía ningunos derechos. No tenía deber alguno, de acuerdo con el estatuto, de ejecutar, y, por tanto, no dejó de ejecutar ninguno de los actos o cosas la ejecución de los cuales era por la ley un deber terminante del acusado cuya omisión en cumplir con dicha obligación constituye la parte fundamental del delito. El agente de rentas internas ni cometió ningún delito ni fué causa de que hubiera un criminal. El fingió meramente prestar su conformidad al plan propuesto por el acusado a quien permitió hacer lo que voluntariamente había ideado y deseaba llevar a cabo. No hubo trama, instigación, aliciente o invitación por parte del Gobierno o de cualquiera de sus agentes, sino que el acusado enteramente y por su propia iniciativa sugirió y repetidas veces propuso y lo que todavía fué más desgraciado para él, insistió en establecer con el denunciante Vázquez las mismas relaciones que alegó dicho acusado que había sostenido con los anteriores agentes de rentas internas de servicio en Mayagüez y el procedimiento continuado del mismo sistema para defraudar al Gobierno, en el cual el acusado

espontáneamente confesó que había estado ocupado en connivencia con dichos anteriores agentes.

No es necesariamente cierto que "el apelante no podía por sí solo cometer el delito imputado." El pudo haber perforado el tubo por el que pasa el alcohol destilado al depósito, o en otra forma haber extraído una parte de la cantidad total. Pudo haber construído un escotillón oculto en el piso del edificio. Podría haber obtenido dobles llaves que sirvieran a los candados del almacén y de los tanques. Pudo haber falsificado, robado u obtenido a precios reducidos de algún funcionario del Gobierno que obrara de mala fe los sellos que habían de ser fijados a las facturas. Pudo haber ideado otro método más ingenioso o menos visible. Pero eso no es importante. No podía haber cometido el delito en la forma que eligió para cometerlo y en realidad lo cometió en estos casos particulares sin el verdadero o fingido consentimiento y conformidad del agente del Gobierno. Eso es de igual modo cierto en la gran mayoría de casos en los cuales el proporcionar la oportunidad que se desea se solicita o que es necesaria y el facilitar la comisión de un delito ideado, concebido y en realidad consumado por el acusado se ha considerado por las cortes que es un medio razonable y legítimo de obtener prueba para la acusación y convicción de los criminales.

Las secciones 21, 22 y 23 de los Reglamentos de Tesorería que prescriben la forma de pago de los impuestos sobre espíritus destilados como ya hemos indicado se citan en el caso de *El Pueblo* v. *Fajardo*, 21 D. P. R. 451. El método que allí se describe fué el mismo seguido en estos casos como ha sido descrito en detalle por el primer denunciante respecto al alcohol sobre el cual se ha pagado el impuesto en cada caso. A la verdad que aun en cuanto al alcohol sobre el cual no se pagó ningún derecho, los Fiscales en su esfuerzo por impugnar y poner a prueba por medio de una acusación enmendada el criterio de la corte sentenciadora como ha sido

evidenciado por su proceder al absolver al acusado en el caso que fué juzgado primeramente, parecen haber ido algo más allá de lo necesario o de lo que estaba justificado por los hechos que en realidad estaban envueltos en la cuestión, al alegar "que dicha cantidad de espíritus destilados fué entonces y allí extraída por Félix Vázquez por orden y dirección y obdeciendo la exigencia de dicho Mateo Fajardo Cardona." El mismo acusado, o sus agentes o empleados, extrajeron el alcohol sobre el cual no se había pagado ningún derecho así como también aquél sobre el cual se pagó el impuesto. Fué asimismo el acusado y no el agente quien deliberada y voluntariamente dejó de preparar las facturas, de comprar, fijar y cancelar los sellos y de remitir la prueba de dicho pago al Tesorero como a él se lo exige la ley y los reglamentos y no al agente. El solo realizó y ejecutó cada uno de los actos de comisión y omisión necesarios para constituir el delito del cual se le acusó, que no consiste en la separación ilegal de los candados del almacén y tanques, sino en dejar de pagar los derechos sobre cantidades específicas de alcohol extraído por él de la fábrica con anterioridad a dicha separación.

Pero hasta en el hurto, en que es un elemento el consentimiento, el colocar una trampa por el dueño de la propiedad no es siempre una defensa; y por lo menos existe autoridad muy eminente y respetable que sostiene el criterio de que en casos de escalamiento, el mero hecho de que un sirviente que actúa de acuerdo con las instrucciones del dueño del establecimiento, pero también a instancia de los perpetradores del delito les proporcione su entrada abriendo una puerta, no los exime necesariamente de responsabilidad.

"1. *Vigilancia.—Planes para coger en una trampa.*—Si un hombre tiene sospechas de que un delito va a cometerse y en vez de tomar precauciones contra el mismo se pone en guardia y descubre y arresta a los transgresores, tal persona no consiente por ello en su conducta, o les proporciona alguna excusa. Y el caso no es generalmente de otro modo aunque la vigilancia esté acompañada de artimaña.

"2. *En el hurto* el exponer la propiedad o dejar de protegerla en la creencia de que el ladrón la tomará, o el proporcionar cualesquiera otras facilidades o tentaciones a dicho transgresor o a cualquiera otra persona, no implica un consentimiento según la ley.

"3. *El escalamiento* proporciona un frecuente ejemplo en los casos en que aquellos que pretenden penetrar en una casa y robar inducen al sirviente del que la ocupa a que les ayude, quien después de dar cuenta de los hechos a su principal éste le autoriza aparentemente para que se una a ellos. Según todas las opiniones los ladrones son personalmente responsables de los actos que ejecuten por razón de dicho convenio; pero la doctrina inglesa parece ser la de que si el sirviente abre la puerta mientras ellos penetran, no son éstos culpables de escalamiento. En principio probablemente no lo son si ha de considerarse que el sirviente actúa como agente del dueño y no de ellos, al abrir la puerta. Pero como ellos solicitaron *del sirviente que se les uniera, y el consentimiento dado por el principal era meramente para lograr la detención de los mismos el mejor criterio parece ser el de que el sirviente* es el agente de ellos en el escalamiento y los considera responsables de dicho escalamiento." \* \* \* (Bastardilla nuestra). 1 Bishop, Nueva Ley Criminal, pág. 142, sección 262.

Véanse también los casos de *People* v. *Smith,* 251 Ill. 185, 95 N. E. 1041; *State* v. *Smith,* 33 Nev. 438, 117 Pac. 19; y *Rex* v. *Chandler* (1913) 1 K. B. 125, todos los cuales se citan en la nota del caso de *Kemp* v. *United States,* 51 L. R. A. (N. S.) 825, en las páginas 827 y 828, y otros casos citados en la nota del caso de *State* v. *Smith,* 30 L. R. A. (N. S.) 946, en las páginas 950 y 951.

Los hechos en los casos presentes no requieren un análisis acabado de la ley aplicable a los mismos o un extenso examen de las autoridades con el objeto de establecer sutilezas. Si consideramos como cierta la prueba del Fiscal, como estamos obligados a hacerlo a falta de algún error manifiesto por parte de la corte sentenciadora al declarar culpable al acusado, estos casos quedan tan clara y completamente comprendidos dentro de los principios generales establecidos por el peso abrumador de las autoridades, que citaremos simplemente algunos párrafos de fuentes elementales.

"No constituye una defensa el hecho de que un hombre fuera cogido en una trampa al cometer un delito.

"1. A menos que las circunstancias demuestren el consentimiento por parte del perjudicado y que la falta de consentimiento sea un elemento esencial del delito.

"2. O, quizás, a no ser que la comisión del acto fuera debida a la activa cooperación e instigación por parte de las autoridades públicas.

"*Mero hecho de coger en una trampa.*—Si se sospecha de que un hombre tiene la intención de cometer un delito, ni la persona contra quien va dirigido su acto ni las autoridades públicas están obligados a tomar medidas para evitar su comisión. Pueden preparar una trampa para la persona sospechosa, y si comete el delito y se le acusa, generalmente no será una defensa el haber sido cogido en una trampa. * * *.

"Debe aparecer, sin embargo, que la misma persona acusada hizo todo lo necesario para realizar un delito completo, y si existe algo más de la mera trampa puede esto impedir que sea castigado el acto de la persona de quien se sospecha. * * *.

"Para que el consentimiento pueda ser una defensa en tales casos debe ser prestado por alguien que tenga facultad para consentir en el acto particular. * * *.

"Aun en los casos de delitos en que la falta del consentimiento no es un elemento esencial, la persona a quien se pone una trampa al realizarlos no siempre debe ser castigada. El sentimiento público como también la inclinación de las cortes están fuertemente en contra de la práctica de atrapar a personas para cometer delitos por los métodos ordinarios de descubrirlos. Y frecuentemente ha sido censurada la práctica por las cortes y hay casos publicados en los cuales se ha declarado, independientemente de toda cuestión de consentimiento por parte de la persona perjudicada, que un acto criminal no debe ser castigado si el acusado fué inducido a su comisión mediante la cooperación activa y la instigación de los detectives públicos. The Law of Crimes, Clark and Marshall (ed. 2ª.), págs. 222, 224, 226, secs. 160, 161, 162.

"Cuando una persona, o aquellos funcionarios de la ley que están obligados a hacerla cumplir tienen motivos para creer que va a cometerse un delito, o que trata de cometerse, no existe nada que legal o moralmente sea malo en colocar una trampa valiéndose de un ardid o poniendo un policía secreto en observación, o en entrar en conspiración con otros para coger y castigar a los infractores; y el acecho y

vigilancia para denunciar la comisión del delito, por el denunciante o testigos, con el fin de obtener prueba para declarar culpable al infractor, no constituirá defensa en una causa por la comisión de dicho delito u ofensa.

"La ley en lo que respecta a los detectives y personas que facilitasen la comisión del delito puede ser observada como sigue: Cuando para constituir un delito es necesario que sea cometido sin el consentimiento de la parte contra quien se intenta cometerlo, no es una defensa que se ofrecieran oportunidades por el gobierno o el denunciante para la consumación del delito.   *   *   *.

"El empleo por el Gobierno de un policía secreto a manera de aliado, no impide el que pueda seguirse una causa en los casos en que el policía no se hace aparecer como principal en el delito.   En esto se establece una diferencia entre el detective y el que facilita la comisión del delito.   El detective revela lo que a menudo puede ser por la agencia de los mismos criminales a quienes se les hace quedar desprevenidos, *un delito ya preparado; la persona que induce a cometer el delito sugiere el delito y es, por tanto, el que lo origina.* Es cierto que todos los detectives son en cierto sentido personas que facilitan la comisión del delito, y todos estos últimos en cierto modo son detectives.   Pero *cuando el que facilita la comisión deja de ser detective* y se convierte *al parecer en causante* del delito, entonces resultan una de las dos consecuencias.   Si no fué empleado por el Gobierno, viene a ser un co-conspirador sujeto al mismo castigo que sus asociados, de acuerdo con el mismo principio por el cual una persona que se apropia bienes perdidos con el objeto de obtener una remuneración puede ser acusada de hurto.   Si por el contrario fué empleado por el Gobierno *para hacer que se cometa el delito,* el Gobierno está imposibilitado para solicitar que los infractores que de tal modo han sido cogidos sean declarados culpables.   Son asociados del Gobierno en la comisión del delito y siendo el delito mancomunado, la acusación tiene que fracasar.   Si aquello que ejecuta un principal no constituye un delito no puede ser declarado culpable el otro principal por prestarle su ayuda.

"Los detectives, cuyos deberes están limitados a observar un delito cuando está tramándose, o de investigar sus causas cuando se ha perpetrado y *quienes no lo han instigado o favorecido, menos en lo que sea necesario con el fin de poder informar respecto a su naturaleza,* son funcionarios públicos con derecho, cuando actúan de buena fe y discretamente, a toda confianza y protección.   Es cierto que ha de tenerse en cuenta el celo que a veces conduce a que funcionarios

de esta clase den la importancia que no deben a supuestos signos de delito.    También es importante que sus declaraciones, siempre que fuere posible, sean corroboradas.    Pero la mera *presencia y aparente aprobación* de un policía, no es defensa cuando no existe *instigación autorizada del delito,* por parte del Gobierno, ni *a fortiori* la presencia y aparente aprobación de un detective fingido, que no es tenido como tal por el delincuente, nombrado para proceder como tal por el Gobierno o las partes perjudicadas.''    (Bastardilla nuestra.)    1 Wharton, Criminal Law, 11ª. edición, páginas 229, 230, 232, pár. 190.

''La mayoría de los delitos envuelve en su comisión una violación del derecho de la persona o propiedad, y ha sido promovida la cuestión de si el consentimiento de las personas afectadas relevará de criminalidad un acto que de otro modo es criminal.    Teóricamente la pregunta puede contestarse fácilmente.    Si el realizar cierto acto particular es un delito prescindiendo del consentimiento de cualquier persona, desde luego que entonces el consentimiento no constituye una excusa.    Son ejemplos de esta clase de delitos el homicidio, la violación según el estatuto, el aborto, el soborno, las ventas de licores intoxicantes no autorizadas, el hurto de documentos públicos, el extraer cartas u otras cosas del correo de los Estados Unidos y el ejercer sin licencia una profesión u ocupación para la cual se exige un permiso.    Por otra parte, si la falta de consentimiento es un elemento de un delito, es asimismo claro que un acto ejecutado con el consentimiento de la persona a quien afecta no puede servir de base a una acusación criminal.    *    *    *

''*Supuesta ayuda criminal.*—A veces se presenta una situación en que el acusado de tratar de cometer un delito, por ejemplo, el de escalamiento, le propone a un tercero que le ayude, y queriendo éste coger al acusado y asegurar su culpabilidad presta su consentimiento al plan y le ayuda a llevarlo a cabo después de dar cuenta a las autoridades.    En tal caso no puede ser declarado culpable el acusado a menos que ejecute o tome participación en todos los actos que son necesarios para constituir el delito.    El principio que aquí está envuelto es que no puede imputarse al acusado ningún acto ejercitado por el que le facilita su comisión porque este último no tiene intención criminal.

''*Medios de coger en trampa a criminales de quienes se sospecha.*— En vista de los hechos bien conocidos de que generalmente los criminales trabajan en secreto y de que algunas prácticas ilegales son favorecidas y protegidas por una gran clase de ciudadanos, a menudo se hace necesario recurrir a varios artificios para hacer cumplir la

ley y castigar su violación. Se ha dicho en los párrafos que preceden inmediatamente, que ordinariamente no se permite a ninguna persona para obtener la convicción de otra por virtud de una acusación criminal que procure que realice el acto. Pero existe una clara diferencia entre inducir a una persona a ejecutar un acto ilegal y el preparar una trampa para cogerlo en la ejecución de propósitos criminales concebidos por él mismo. Puede, por tanto, expresarse como regla general en cuanto a los delitos que afectan a individuos en particular, que si el propósito criminal fué concebido por el que ejecuta el acto no puede evitar que se le declare culpable por el mero hecho de que la persona afectada preparó una trampa o facilitó la ejecución del plan, o porque sus agentes parecen haber ayudado al que ejecutó el acto para que fuera cogido en su ejecución. Una persona que tiene conocimiento de un plan que se trama contra ella puede quedarse callada y dejar que las cosas sigan su curso, con el fin de apresar al criminal, sin que se le considere que ha consentido en el acto; pues el consentimiento que hace que un acto pierda su carácter de criminal es algo distinto de la mera sumisión pasiva sin existir algún entendimiento previo con el criminal. La misma regla es aplicable a los funcionarios de policía. Es su deber traer a los criminales ante la justicia así como evitar el delito y pueden permitir que un criminal lleve a cabo sus fines que son conocidos para que exista una causa contra él, pero no pueden hacer que una persona cometa un delito y obtener luego su convicción."  \* \* \*  \*.   8 R. C. L. págs. 126, 127, 128, secs. 101, 104, 105.

"Aunque la verdadera línea divisoria no aparece tan claramente trazada como debiera serlo, y hay casos en que parece haberse prescindido enteramente de ella de manera que la sentencia está aparentemente en el lado equivocado, las siguientes proposiciones han sido bien sostenidas por los casos resueltos:

"1. Si el intento criminal se origina en el acusado y la supuesta víctima no le ayuda activamente en la comisión del delito, el mero hecho de que facilite la ejecución del plan y de que sus agentes parezcan cooperando en su ejecución no constituirá defensa para el acusado \* \* \*.

"2. Si el propósito se origina por aquel que aparentemente resulta ser la víctima o por su agente, y se le sugiere al acusado y es meramente adoptado por él, no puede ser declarado culpable.

"Como parte de esta regla puede decirse además, que para declarar culpable al acusado él mismo debe haber hecho todo lo que era necesario para constituir el delito. No puede hacérsele responsable por actos del agente de la víctima.

"De modo que cuando se procura la comisión del delito por el denunciante para algunos fines suyos, no parece haber motivo para declarar culpable al acusado y tal es la regla cuando el delito en cierto modo puede ser considerado como cometido contra el denunciante y la falta de su consentimiento es un elemento necesario del delito.

"Pero hay una clase de casos en que se procura la comisión del delito con el propósito expreso de proporcionar causa para la acusación en los cuales el hecho de la incitación se ha declarado que no constituye defensa. Estos casos parecen comprender delitos que más bien pueden ser considerados como en contra del público en general que contra el denunciante." Nota al caso de *Connor* v. *People,* 25 L. R. A. 341.

Se observará que en gran parte hemos dejado de considerar la clase de casos a que se ha hecho referencia últimamente, aunque en muchos de ellos, como por ejemplo, el tomar cartas fingidas para coger al delincuente, no es otra cosa que el facilitar la comisión del delito.

Así pues, en el caso de *Scott* v. *United States,* 172 U. S. 343, la Corte Suprema hace la siguiente cita de la opinión del caso de *Goode* v. *United States,* 159 U. S. 663:

"No importa en lo que respecta al deber del cartero que la carta sea genuina o preparada con artimaña, con una dirección ficticia. Al venir a su poder como tal cartero, es su deber considerarla según lo que de su faz representa ser, una comunicación genuina; tratar de entregarla, o si la dirección no está dentro de su ruta, entregarla al debido cartero o ponerla en el apartado general (*list box.*) El ciertamente no tiene más derecho para apropiársela que el que tendría si fuera genuina. Para los fines de estas secciones una carta es un escrito o documento, que tiene la apariencia externa de una comunicación genuina y viene a poder del empleado en el curso regular de sus asuntos oficiales. Sus deberes en cuanto a la misma no son menores por el hecho o por el conocimiento que tenga que no es lo que representa ser; en otras palabras, no incumbe a él juzgar respecto a su autenticidad."

La opinión en el caso de Scott termina entonces como sigue:

"Las dificultades que hay para averiguar esta clase de delitos

son muy grandes, y no debe el estatuto ser interpretado de tal modo que impida sustancialmente que pueda obtenerse una convicción de acuerdo con el mismo. Una carta que tiene por objeto coger a un infractor no está sujeta a la crítica que debidamente se hace con frecuencia respecto a otros medios a que a veces se acude, o sea poner la tentación ante un hombre y hacer que cometa un delito. No hay tentación en una carta que tiene por objeto averiguar un delito. Es igual que todas las demás cartas en cuanto a la apariencia externa, y el deber del cartero que la recibe es igual.

''El hecho de que es para una persona ficticia según todas las probabilidades es enteramente desconocido del cartero, y. aún cuando lo sepa, es inmaterial. En verdad que de ser sospechado por el cartero, la sospecha haría que tuviera un cuidado particular para garantizar su seguridad, bajo la creencia de que era con el objeto de averiguar alguna falta.''

No necesitamos parafrasear dicho lenguaje para aplicar el mismo principio por analogía a los casos que ahora están sometidos a nuestra consideración.

No hemos creído necesario discutir qué efecto podría haber tenido en estos casos la incitación, invitación o aliciente por parte del agente de rentas internas, porque, como ya hemos indicado, él no gestionó la comisión del delito.

No nos hemos sentido obligados a considerar las necesidades que tuvo el Gobierno al tratar de cuestiones de esta clase. Podemos, sin embargo, óbservar de paso, que en tanto pueda encontrarse algún mérito en la alegación del apelante de que el delito sólo puede ser cometido en, connivencia con un agente de rentas internas, y en tanto pueda la necesidad justificar la lenidad o modificación de un principio legal, la alegación de exención de responsabilidad por este fundamento, de ser alegado por el Gobierno, parece tan digna de ser tomada en consideración como en la mayoría de los casos en que tal elemento ha ejercido una influencia predominante. Si el delito el cual por su misma naturaleza necesariamente se comete en secreto sólo puede ser cometido mediante connivencia con un agente de rentas de mala fe, entonces la oportunidad que tiene el Gobierno para hacer

cumplir la ley queda reducida a la muy remota posibilidad de poder condenar a una de las personas culpables por la declaración de la otra. De aquí resulta, según el mérito que pueda tener la alegación, que si no puede el Gobierno hacer lo que ha hecho en estos casos, la ley que castiga el dejar de pagar los impuestos sobre alcoholes con anterioridad a su remoción de la fábrica se convertiría en letra muerta en el estatuto y el Gobierno y sus rentas quedarían sin protección alguna en manos de los destiladores de mala fe y de agentes corrompidos, débiles o en los que fácilmente puede ejercerse influencia. Semejante situación sería premiar la falta de honradez a expensas de las rentas insulares y de aquellos destiladores, pues podría voluntariamente o pagar los derechos o ser obligado a ello por la devoción indeclinable al cumplimiento del deber de un agente de rentas internas honrado e incorruptible.

Además, aunque hemos preferido tratar esta cuestión en gran parte como si el Gobierno fuera un individuo particular y el delito uno que envolvía el elemento de consentimiento por parte del perjudicado, todavía así no habría de entenderse que sostenemos que el Attorney General, o el Tesorero de Puerto Rico, u otro funcionario del Gobierno, puede consentir en favor del Gobierno en que se cometa un delito contra el mismo. Puede ser que por instigación al delito pudiera hacerse imposible el perseguir un delito cuya comisión fué de tal modo procurada por ellos; eso, como hemos demostrado, es una cuestión que no está necesariamente envuelta en este caso. El delito por el cual fué declarado culpable el acusado, es un delito contra el público, y no contra los Fiscales. Parece razonablemente seguro decir que ni el agente de rentas, ni el Tesorero ni el Attorney General de haber en realidad consentido o estado conforme en la comisión del delito por parte del acusado, lo que no hicieron, podrían atar de manos al Gobierno de tal modo, o conceder la absolución del acusado por su delito contra el público. Sólo enunciar la proposición es bastante para refutarla.

El acusado por su misma declaración, de ser cierta la declaración de Vázquez, había estado por algún tiempo defraudando al Gobierno en los derechos. El Gobierno, sospechando que se estaban cometiendo fraudes, envió un agente de confianza a Mayagüez para hacer una investigación. Este prontamente fué llamado por el acusado y fingió someterse a la influencia que de tal manera se ejerció sobre él. El acusado creyó que contaba tanto con el consentimiento como con la conformidad de Vázquez; pero no comprendía que el Gobierno hubiera convenido hacer una rebaja o que el dinero pagado a Vázquez era en arreglo con el Gobierno por los impuestos debidos. Sabía que el agente de rentas no podía servir a dos jefes. Creyó que Vázquez había faltado a su deber oficial. En cuanto a esto el acusado confió en la debilidad de la naturaleza humana y en su experiencia acerca de ella. No dejaba de saber el riesgo que corría de que el hombre a quien creyó dispuesto a permitirle mediante una remuneración defraudar al Gobierno, bien por motivos superiores o por la esperanza de un futuro ascenso, o hasta guiado por algún impulso algo más funesto, podría entregarlo a las garras de la ley. Se resolvió a correr este riesgo y deliberadamente infringió el estatuto. Los hechos no tanto revelan una trampa preparada por el Gobierno como el hábil descubrimiento del proyecto de defraudar al Gobierno en sus rentas.

"Y al final, en estos planes frustrados, recayó el castigo en su propio autor."

Lo demás del razonamiento que hace el apelante en el señalamiento noveno se refiere enteramente al conflicto entre la prueba del Fiscal y la que fué presentada por la defensa. Como ya hemos dicho, la corte sentenciadora prefirió dar crédito a los testigos del Gobierno. No hay imputación categórica de haber existido pasión o prejuicio y no podemos decir que la corte sentenciadora cometiera algún error tan

manifiesto en este sentido que exija la revocación de las sentencias.

De intento nos abstenemos de entrar en discusión sobre ninguna cuestión relativa a la suficiencia de la prueba que no fuera promovida por las partes en la corte inferior o sugerida por cualquiera de las mismas en apelación.

Las sentencias apeladas deben ser confirmadas.

*Confirmadas las sentencias apeladas.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, del Toro y Aldrey.