THE STATE OF KANSAS v. MARION ASBELL.

No. 10587.

1. CIRCUMSTANTIAL EVIDENCE — *of homicide examined and conviction sustained.* The defendant was charged with the murder of his wife, whose body, with a bullet hole through the head and a pistol near the hand, was found in the cellar. The State mainly relied on circumstantial evidence, as no witness saw the wound inflicted. His relations with her had been unpleasant, and there is testimony that he held illicit relations with a daughter of the deceased by a former husband and wanted to be rid of his wife so that he might marry and live with the daughter. The wife had discovered the relations between her husband and daughter and was contemplating a prosecution. She was much troubled about the conduct of her family; and the theory of the defense was that she took her own life. The trial resulted in a conviction, and upon an examination of the testimony it is *held* to be sufficient to sustain the verdict.

2. FIREARMS EXPERT — *may testify results of experiments with weapon.* The hair around the bullet hole was not singed, nor were there any powder marks on the flesh, and it is claimed that, if she had fired the pistol, it was necessarily close to her head and the hair would have been singed and the flesh powder-marked. A witness experienced in the use of firearms who had conducted experiments by shooting at human hair and a paper target with the pistol with which the deceased was killed and with cartridges similar to those found therein at distances ranging from 6 inches to 10 feet, was permitted to testify as to the effects resulting from the shooting upon the hair and also as to powder marks. *Held,* that the testimony was admissible.

3. MEDICAL EXPERT — *may give opinion from appearance of wound as to distance whence shot fired.* A medical expert, qualified by study and experience, who examined the body of the deceased shortly after the wound was received, may give his opinion as to whether it was produced by a near shot or one fired from a distance.

The State v. Asbell.

4. INSTRUCTIONS—*improper remark in, jury not misled, not reversible error.* An erroneous remark in an instruction inadvertently made by the court which evidently did not mislead the jury is not a ground of reversal.

5. INDICTMENT OR INFORMATION—*accused in custody when filed, triable same term.* If the defendant appears or is in custody at the term at which an indictment or information is found, the case is triable at that term, unless continued for cause, although he may have been arrested and his preliminary examination had after the commencement of that term.

6. CONTINUANCE—*no reversal for refusing unless discretion abused.* An application for a continuance of a cause rests largely in the discretion of the trial court, and unless there has been an abuse of discretion the refusal of a continuance will not ordinarily be ground for a reversal.

7. QUESTION TO WITNESS—*intended to elicit material facts, purpose not apparent nor disclosed, not error to sustain objection to.* As the manner of death of the deceased could not be established by direct evidence, and as some of the circumstances of the case were not inconsistent with suicide, the declarations of the deceased shortly before her death evincing an intention to commit suicide were admissible; but, as the question asked did not indicate that such evidence was desired and the court was not informed what was intended to be drawn out by the inquiry, overruling the same was not error.

8. DECLARATIONS—*accused cannot prove his own self-serving, to third person.* A conversation between the defendant and another which is in the nature of a self-serving declaration, was properly excluded from the jury.

9. OBJECTION TO EVIDENCE—*ground not stated, not error to overrule.* Where evidence is admitted over the objection of a party, but the grounds of the objection are not stated, no error is committed in overruling it.

*Appeal from Labette District Court.*
*Hon. A. H. Skidmore, Judge.*

AFFIRMED.     OPINION FILED NOVEMBER 7, 1896.

*W. B. Glasse, J. H. Crichton,* and *J. D. McCue,* for appellant.

*A. B. Switzer,* County Attorney, and *Kimball & Osgood,* for the State.

JOHNSTON, J.    Marion Asbell was convicted upon a charge of the murder of his wife at their home in Labette County on January 29, 1896, and from the judgment of conviction he appeals.    They were married nearly two years before the death of Mrs. Asbell, and during that time had resided upon a farm which was situated about four miles from Chetopa.    Each of them had been previously married, and by the first marriage the wife had two children living at the time of her death, named Maggie Whitehouse, about 17 years old, and Carson Whitehouse, whose age was about 15 years.    By her marriage with the defendant she had one child, which was nearly 11 months old at the time of her death.    Maggie made her home with the defendant after his marriage with the deceased, but the testimony tends to show that Carson's presence was not agreeable to the defendant and that prior to the marriage it was agreed that he should not live in their home.    He lived in a number of places, and it appears that his conduct was such as to give his mother much concern and worry.    Testimony was offered tending to show that previous to the defendant's marriage to the deceased he had had sexual intercourse with Maggie, and that illicit relations between them continued until the death of his wife ; that, as a result of these relations she became pregnant, and the defendant took her to a doctor, where an abortion was produced ; that, within a few months after their marriage, the wife suspected improper relations between her husband and Maggie, and at one time, and for this reason, some steps were taken toward obtaining a divorce, but the effort was abandoned.    There is testimony to the effect that the conduct of her hus-

1. Circumstantial evidence, conviction sustained.

band and daughter caused her great anxiety, and some also that she was contemplating the commencement of legal proceedings against them as soon as sufficient proof of their wrongdoing could be obtained.   She was also worried by her son, who had been living with the father of the defendant, where he was charged with purloining money, and on returning home the day previous to the death of his mother, had a difficulty with the defendant and was ordered to leave the premises and not return again.

On the morning of January 29, 1896, Mrs. Asbell arose early and assisted Maggie in preparing breakfast, but she declined to eat any, and while the defendant and Maggie were eating she was bowed down, holding her head in her hands, and was apparently in a troubled and despondent state of mind.   On that morning she asked the defendant for a horse and buggy with which to go to Oswego, the county seat, and also to one of her brothers who lived about six miles distant, but both of her requests were refused. He gave the horse and buggy to Maggie with which to go upon an errand, and, taking another horse, he rode out to his work upon the farm.   Maggie returned home about 10 o'clock and found that her mother was missing and that the baby had been placed at the window and hemmed in with a trunk and sewing-machine in such a way that it could scarcely move. It had evidently been in this position for some time, as it had cried until it was hoarse and exhausted. Not finding her mother, Maggie called the defendant from the field, and without making any search about the premises he went to the homes of two of the neighbors and made inquiries as to the whereabouts of his wife.   Dinner was prepared and eaten, after which a neighbor called and suggested that a

search be made in the cellar of the house, which was accordingly done.     There the body of Mrs. Asbell was found, lying on its back, the right arm partially extended ; and a revolver was found lying a few inches from the right hand, with a pool of blood under the head and neck.     It was discovered that she had been shot through the head, the bullet entering back of the right ear and passing downward and slightly toward the front, fracturing the skull on the left side of the head, where it was found about three-fourths of an inch lower than a point opposite the point of entrance and one-half an inch in front of it.     At the coroner's inquest Maggie denied that illicit relations had existed between her and the defendant ; but she subsequently testified that such relations had existed, and that the defendant had suggested that when he got rid of his wife he would marry Maggie, and move to another location, where they would live together as man and wife.

The theory of the State is that he desired to be rid of his wife in order to live with Maggie, and further, that the wife had long suspected the improper relations between her husband and daughter, which continued until the previous night, and was about to institute a prosecution against them ;     that, after Maggie had been sent from home, he returned to the house, killed his wife, placed her body in the position in which it was found, and then returned to the field to await the discovery.

The theory of the defense is that, becoming despondent over the conduct of her children and husband, Mrs. Asbell had taken her own life.

At the opening of the trial the defendant insisted that the cause was not triable at the February term of court.     The term began on February 4, 1896, seven

days after Mrs. Asbell was killed and three days after the defendant was arrested upon the charge of killing her.   The preliminary examination was held on the 13th and 14th days of February.   The information was filed on February 15, and the trial was begun on February 24.   It is contended that the case was not triable until a term of court beginning after the preliminary examination was concluded.   This contention is based on section 57 of the Criminal Code, which provides :

5. Acc"sed in custody, triable same term.

" When the prisoner is admitted to bail, or committed by the magistrate, he shall also bind, by recognizance, such witnesses against the prisoner as he shall deem material, to appear and testify at the next term of the court having cognizance of the offense, and in which the prisoner shall be held to answer."

The words "next term" ordinarily mean the next subsequent term, and if there was no other provision on the subject there would be much force in the defendant's contention.   We are not to determine the question, however, upon inferences drawn from provisions with reference to other subjects, for the Legislature has specifically declared when a criminal cause is triable, as follows :

"All indictments and informations shall be tried at the first term at which the defendant appears, unless the same be continued for cause.   If the defendant appear or is in custody at the term at which the indictment or information is found, such indictment or information shall be tried at that term, unless continued for cause."   § 157 Crim. Code.

The language is plain and direct, leaving no doubt that the cause was properly triable at the February term.   The defendant was in custody at the February term, when the information was filed, and under the statute the Court was required to try the cause un-

less cause for continuance was shown. The two sections seem to be somewhat inconsistent, but the express provision of section 157 must prevail over a mere inference drawn from section 57. The word "next" means *nearest*, and the words "next term," as used in section 57, when construed in connection with section 157, may be taken to mean the nearest term at which the cause is triable.

An application for a continuance was made, based mainly on averments that the killing of Mrs. Asbell and the charge that it had been done by her husband had aroused great indignation in the community toward him and that there was such excitement and passion as to prevent a fair trial. The time for preparation was quite brief, and it would 6. Refusal of continuance. seem as if the application might properly have been granted. It was not stated that there was testimony which the defendant was unable to procure at that term, nor did the affiant express a belief that the defendant could not then have a fair trial. No application for a change of venue on account of public prejudice was made, and there appears to have been no trouble in securing jurors who had not formed or expressed an opinion upon the merits of the case. We cannot say that the Court abused its discretion in refusing a continuance.

Many objections are made to rulings admitting and excluding testimony, but some of them are not of sufficient consequence to require special comment. There is complaint that the statements and suspicions of the neighbors as to illicit relations between the defendant and Maggie Whitehouse were admitted in evidence. Some questions tending in that direction were asked, but the testimony elicited was not important or prejudicial. Direct testimony was given

as to the illicit relations, and none of the questions raised upon the testimony concerning these relations are deemed to be material.

The objection to the testimony of Maggie that her mother was ordinarily willing to do what defendant requested her to do, is without force. It was competent and material to show the relations which existed between them, and the only objection made to this testimony is that it was immaterial. It was also competent to show the condition of things in the house at the time the body was found, and the surrounding circumstances, and hence the testimony that partly burnt cloth was found in the cook-stove was received. It could not have been very material, but certainly its admission is no good cause for complaint.

A witness of the defendant who had talked with the deceased some time before she was killed, was asked what she had said about her children's conduct and the effect it had upon her, but an objection to the inquiry was sustained. It is contended that the theory of the defense was that the deceased came to her death by her own hand, and it was competent for them to show not only a purpose to take her own life, but that the conduct of her children was such as to lead her to suicide. As the manner of death could not be established by direct testimony, and as some of the circumstances of the case were not inconsistent with suicide, the declarations of the deceased shortly before her death, evincing an intention to commit suicide, were admissible. The question asked, however, did not indicate that such evidence was desired, nor does it appear that the Court was informed what was intended to be drawn out by the inquiry. A narrative of what the

7. Questions to witness.

deceased said about her children's habits would ordinarily be inadmissible, and probably the objection to the question was sustained because its purpose was not disclosed.   This is the more apparent from the fact that the Court did permit a full investigation as to the conduct and statements of the deceased showing her state of mind or an intention to take her own life.

No error was committed in excluding a conversation between the defendant and his father in regard to trouble which the father had with Carson Whitehouse.   This testimony and the reasons proposed to be given by the defendant for excluding the boy from his home were in the nature of self-serving declarations and were not admissible under any rule of evidence.

8. Defendant cannot prove self-serving declarations.

Several months prior to the death of Mrs. Asbell, there was some talk between her and the defendant in regard to obtaining a divorce.   The defendant took his wife to the county seat and there they consulted a lawyer about divorce proceedings.   After stating these facts the defendent was asked what conclusion he and his wife reached concerning divorce after the consultation was had, and if they did not leave Oswego on that day agreeing that no steps for a divorce should be taken.   The objection to these questions was properly sustained, as a witness must state the facts so far as they are competent and material, and is not permitted to give his own conclusions.

Some questions of an objectionable character were asked, but no objections were made to them, and hence no error can be predicated thereon; nor is a general objection to testimony available.   A picture which had been in the possession of the defendant was introduced in evidence over an objection, but the

grounds of the objection were not stated, and it was therefore properly overruled. *Humphrey v. Collins*, 23 Kan. 549 ; *Stout v. Baker, Sheriff*, 32 id. 113 ; *Smith v. Morrill*, 39 id. 665.

A witness named Rambo gave testimony as to experiments made by him with the pistol with which Mrs. Asbell was killed and with cartridges similar to those which were found therein after her death. The first shot was at a bunch of hair placed six inches from the muzzle of the revolver, and the result was that it was torn from its fastenings and scattered so that the effect upon the hair could not be told. The next was at a piece of paper 30 inches away, and it was found that it was badly powder-burnt, some of the powder going clear through the paper. The next was at a distance of four feet, when the paper was considerably powder-burnt, a portion of the powder going through the paper. One fired at a distance of six feet showed powder marks upon the paper ; and there were slight powder marks on a paper that was eight feet away. A shot fired 10 feet away left no impression on the paper. The last experiment was firing at a bunch of hair 30 inches away, and there the hair was considerably singed and burnt. After the testimony was received the Court for some reason excluded it from the consideration of the jury. It is contended that the testimony was improper and the withdrawal of the same did not cure the error. We think the testimony was competent for the purpose of determining the effect of a pistol shot fired at human hair, and to show how much the powder marks from that particular pistol would scatter. It appears that it would have been very difficult for Mrs. Asbell to have held the pistol in such a position as to make the wound

2. Firearms expert may testify.

that was found in her head. If it was possible at all, the pistol must have been close to her head, and must necessarily have left powder marks and singed and burnt her hair. No powder marks were found upon her head, nor could it be ascertained that the hair was singed or burnt. The experiment, having been made under similar conditions and circumstances, threw light upon the effect of a pistol shot fired at human hair from a given distance, and also enabled the jury to ascertain how much the powder marks would scatter in a given distance. It was not offered for the purpose of showing that the wound itself was a near wound, but there was an abundance of other testimony introduced for that purpose. In *The State v. Jones*, 41 Kan. 309, it became important to ascertain the distance that the defendant was away at the time he fired a musket and killed the deceased. Persons, who had experimented to ascertain how far guns and muskets would carry shot compactly, were held to be competent to testify to the experiments made and to give their opinions based on such experiments as to how much shot would scatter in a given distance. See, also, *Sullivan v. Commonwealth*, 93 Pa. St. 284; *Boyd v. The State*, 14 Lea (Tenn.) 161; 1 Witthaus & Becker's Med. Jur., 609; *Mo. Pac. Rly. Co. v. Moffatt*, 56 Kan. 667. The witness in this case had had experience with firearms, and his testimony giving his opinion and the results of the experiments aided the jury in determining one of the important issues in the case. Under the authorities we think the defendant has no cause to complain of the admission of this testimony.

Medical experts who examined the wound soon after it was made testified as to the appearance and character of the wound, and also as to whether the

pistol which made it was fired close to the head. or from a distance. They described without objection the appearance and indications of near wounds, and their testimony made it clear that the characteristics of such wounds are well known to those who have made a study of gunshot wounds, and whose observation and experience qualify them to express an opinion. Some

3. Medical expert may give opinion.

of these characteristics are the discoloration of the skin, the powder marks in and around the wound, the burning of the flesh or hair, the form and size of the wounds, and the condition of the tissues along the course of the bullet. It was not denied that the expert testimony was competent to show the characteristics of near wounds, and we see no good reason why qualified witnesses may not give their opinion whether a particular wound was produced by a near shot or one fired from a distance. These symptoms and characteristics do not lie within the range of common experience or common knowledge, and inexperienced persons are not as liable to reach a correct conclusion as persons who have been instructed by study and experience. The characteristics of the wound, such as the color and condition of the skin around it, the coagulation of the blood mixed with powder, the depth of the wound, and the disturbance of the tissues throughout, cannot easily be communicated. to the jury; and some of the indications which would mean much to the expert could not well be described to an inexperienced person. It is well settled that medical experts may give an opinion as to the means by which a wound was inflicted. Rogers, Expert Tes., § 53, ánd cases cited; 1 Greenl. Ev., § 440; *Hammond v. Woodman*, 66 Am. Dec. 235, and note. The question upon which the opinions were given was not a matter directly in issue before

the jury, but these opinions were given upon an incidental matter in order to enable the jury to determine the main issue in the case. We think the law relating to expert testimony was not violated by the admission of these opinions.

Some exceptions were taken to the rulings of the Court in charging the jury, but only one of the instructions given is criticised. In charging the jury that the opinions of the experts were not to be taken as conclusive, but were to be considered in connection with the other evidence, the judge remarked : " You have further observed that some of the witnesses have given testimony in this case as to whether or not the deceased, Maria A. Asbell, came to her death by her own hand," etc. In this respect the Court went astray. It is evident, however, that the remark was inadvertently made, and that the Court was not endeavoring to construe the expert testimony. None of the experts had given such testimony, and from all the remaining part of the charge it is clear that it was not the purpose of the Court to assume the existence of that or any other disputed fact. Under the circumstances we do not think that the jury could have been misled by the inadvertent remark, and unless the jury were misled it furnishes no ground for a reversal.

*4. Impropriety in instructions— jury not misled.*

Complaint is made of the refusal of the Court to give certain instructions upon circumstantial evidence that were requested. In these the Court was asked to instruct the jury in substance that before they could convict the defendant upon the evidence they must be satisfied that the State had proved every essential circumstance beyond a reasonable doubt. We think the charge given was not defective in this respect. Besides giving a general definition of circumstantial

*9. Instruction as to circumstantial evidence.*

evidence, the jury were told that, if they entertained a reasonable doubt upon any one or more of the facts and elements necessary to constitute the offense, they must give the defendant the benefit of such doubt and acquit him. In addition to that they were instructed "that to authorize a conviction of the defendant on circumstantial evidence each of the circumstances should not only be consistent with the defendant's guilt, but they must be inconsistent with any other rational conclusion or reasonable hypothesis and such as to leave no reasonable doubt in your minds or the mind of either of you of the guilt of the defendant." The doctrine of the remaining instructions requested, so far as they were proper, was fairly included within the charge that was given, and we think no error was committed in the refusal.

It is earnestly insisted that the verdict is not sustained by the evidence. After a careful reading and consideration of the same we are united in the opinion that the testimony sustains the finding that the defendant committed the offense charged. The relations which existed between the defendant and Maggie as well as between him and the deceased furnished a motive for the commission of the offense. The testimony makes it very improbable that it was a case of suicide, and there is much in it which tends to connect the defendant with the killing. His conduct before the death of his wife and his conduct immediately after her body was found tends to support the finding of the jury.

The judgment of the District Court will be affirmed.

All the Justices concurring.