EL PUEBLO, DEMANDANTE Y APELADO, *v.* COLLAZO, ACUSADO Y APELANTE.

No. 1981.—*Visto:* Junio 18, 1923. *Resuelto:* Abril 24, 1924.

TRASLADO POR PREJUICIO LOCAL EN CAUSA CRIMINAL.—La concesión de un traslado descansa en la sana discreción del tribunal sentenciador y el apelante tendrá que hacer una fuerte demostración para que pueda ordenarse el traslado.

ID.—*Affidavits* EN APOYO DEL TRASLADO.—La corte o el acusado pueden adicionar las declaraciones juradas mediante prueba testifical, dando a la otra parte una oportunidad de repreguntar. Y cuando los *affidavits* presentan meros hechos que exponen principalmente las conclusiones de los testigos y no se ofrecen hechos tangibles, y la influencia o resultado de publicación en los

periódicos no se demuestra, la corte está justificada en negarse a conceder el traslado y puede suponerse que la corte tenía alguna idea de propio conocimiento del valor de las declaraciones juradas.

Id.—Prejuicio Actual—Constitución del Jurado.—No es bastante que una vez existiera prejuicio, pues frecuentemente éste se calma antes de la época del juicio. El suceso en este ·caso tuvo lugar en diciembre de 1920. El juicio se celebró en diciembre de 1921. Aunque las declaraciones juradas fueron tomadas en 1921, el examen de repreguntas podría haber revelado que los deponentes no habían hecho ninguna nueva investigación reciente. También debe tomarse en cuenta la facilidad con la cual se obtiene un jurado.

Id.—La responsabilidad ante el público de. un traslado corresponde al juez, el hecho de que el fiscal se allanara carece de importancia.

Derechos del Acusado — Inspección Ocular — Derecho Constitucional. — Siendo el objeto de la inspección ocular el que el jurado pudiera determinar si un testigo pudo haber oído el jadeo de dos personas en lucha, a una distancia de quince metros, debe concluirse que tal inspección no era una continuación del juicio y que el acusado no fué privado de derecho constitucional alguno por no estar presente en la inspección él o la corte, especialmente cuando el acusado no solicitó esas cosas.

Testimonio Pericial—Peritos.—Un perito médico puede declarar en vista de la apariencia de las heridas en cuanto a la distancia entre la boca del revólver y el primer contacto de la bala con el cuerpo.

Homicidio—Móvil del Crimen.—Cuando el *corpus delicti* se ha probado y las circunstancias indican que el acusado fué quien perpetró el homicidio, los hechos que tienden aun remotamente a demostrar un móvil son admisibles. Por tanto, la declaración de la madre del interfecto, hermana a la vez del acusado, era admisible para demostrar el estado de las relaciones de familia y la mala voluntad que se alegó tenía el acusado hacia el interfecto.

Id.—Instrucciones sobre Absolución.—Un error alegado en este caso es que la corte, al hablar de los varios grados del delito de los cuales el acusado pudo ser convicto, nada dijo entonces sobre una absolución. *Se resolvió:* que el error no existe porque las instrucciones en conjunto imponían el deber al jurado de absolver en caso de una duda razonable perfectamente clara.

Id.—Nuevo Juicio por Incapacidad de un Jurado.—Cuando después del juicio se pide nuevo juicio por el *motivo* de que un jurado hubiera hecho anteriormente manifestaciones de tener opinión formada contra el acusado, la demostración tiene que ser fuerte.

Sentencia de *Tomás Bryan,* J. (Aguadilla), condenando al acusado por delito de Homicidio voluntario. *Confirmada.*

*J. B. Soto* y *J. Valldejuli,* abogados del apelante; *Sr. José E. Figueras, Fiscal,* abogado del apelado.

El Juez Asociado Señor Wolf, emitió la opinión del tribunal.

El apelante fué acusado del delito de asesinato en primer grado. Se le declaró culpable de homicidio voluntario. Al igual que en el caso de *El Pueblo* v. *Vélez,* 32 D.P.R. 382, el apelante no ha presentado una verdadera exposición

del caso. El se limita a mencionar hechos tales como la acusación, la condena y otras cosas semejantes, pero no expone la teoría de la defensa ni resume en esta parte de su alegato la prueba que tiende a establecer la teoría o una manifestación equivalente. Para tener una idea de' esta defensa hemos tenido que ir a buscarla en las instrucciones de la corte, en la misma transcripción de la prueba y particularmente en la prueba del acusado.

En la vista ante esta corte el apelante abandonó su primer señalamiento de error, pero descansó vigorosamente en el segundo, a saber, que la corte erró al negar la moción de traslado del caso fundada en prejuicio local. En apoyo de su moción de traslado el apelante radicó una declaración jurada suya y la de otras veintinueve personas más. En tanto en cuanto la declaración jurada del apelante no fué contradicha por una contradeclaración jurada del ministerio fiscal, o se insistió sobre ella en el alegato, las treinta declaraciones juradas pueden ser consideradas juntamente. Las otras veintinueve son en su forma y contenido exactamente iguales. Sólo se diferencian unas de otras en que proceden de distintos pueblos en los distritos de Aguadilla y Arecibo. Expresa el apelante que estas declaraciones juradas fueron hechas por rectos o prominentes ciudadanos de las respectivas municipalidades o ciudades, y, desde luego, a falta de alguna demostración o indicación en contrario, dichas declaraciones juradas merecen todo el peso que debe darse a cualquier declaración jurada. Tomaremos como típica una declaración jurada que transcribiremos:

"Yo, Carlos F. Torregrosa, bajo juramento declaro:

"1. Que soy mayor de edad, postmaster y vecino de Aguadilla que forma parte del distrito judicial de Aguadilla, en donde resido actualmente y en donde he residido continuamente por más de 15 años.

"2. Que conozco personalmente a José Collazo, acusado en este caso, que estoy asimismo enterado de que se sigue contra él en el Distrito Judicial de Aguadilla, un proceso por el delito de asesinato.

"3. Que me consta de propio conocimiento que dicho acusado no

podrá obtener un juicio imparcial y justo en el distrito de Aguadilla porque en este distrito existe un gran prejuicio y gran pasión contra él, habiéndose hecho circular insistentemente, la versión, por sus enemigos, de que él es culpable del delito que se le imputa, siendo ésta, con tal motivo, la creencia general que en este término municipal prevalece; porque además, con motivo de la investigación practicada por orden del Departamento de Justicia contra el entonces secretario de la Corte de Distrito de Aguadilla y de la cesantía de éste por irregularidades en el sorteo del jurado que había de conocer en esta y otras causas en el mes de julio de 1921, ha dado a esta causa una tan notoria resonancia en este distrito, que creo de buena fe que no hay ningún jurado en este término municipal que no tenga de antemano formado sobre este caso un juicio, y porque se ha hecho circular por este término municipal, profusamente, el periódico 'Pica Pica' conteniendo un artículo acusatorio para dicho procesado en el cual se le conceptúa como un criminal empedernido y vulgar.''

Con respecto a la ley aplicable al traslado de una causa, hemos examinado, entre otras, las siguientes autoridades: *People* v. *Suesser,* 132 Cal. 631; *People* v. *Congleton, 44* Cal. 92; *People* v. *Yoakum,* 53 Cal. 566; *State* v. *Hillman,* 42 Wash. 615; *State* v. *Dwyer,* 91 Pac. 314; *State* v. *Bess,* 199 Pac. 426; *State* v. *Davis,* 199 Pac. 421; *People* v. *Fuski,* 192 Pac. 552; *People* v. *Kromphold,* 157 Pac. 599; 27 Ruling Case Law, 815; 16 Corpus Juris, 206. Lo que de ellas se infiere es que la concesión de un traslado es cuestión que descansa en la sana discreción del tribunal sentenciador y el apelante tendrá que hacer una fuerte demostración en apelación para que pueda alterarse la resolución; que se presta poca atención a las manifestaciones o publicaciones en los periódicos a menos que se acredite el peso e influencia de los periódicos y que se dé cierta idea de su contenido; que las opiniones de personas respecto a un estado de prejuicio local serán consideradas como mera conclusión a menos que estén fundadas en algo concreto; que si, como resultado del juicio, se obtiene un jurado sin dificultad y no se demuestra que el acusado agotó sus recusaciones perentorias, este es un hecho que ha de considerar la corte de apelación

y el traslado de una causa criminal debe considerarse un mal para el público a menos que las exigencias de la justicia lo requieran.

Tal vez la ley esté bien resumida en el caso de *State* v. *Davis, supra,* citado con aprobación en el de *State* v. *Bess, supra,* a saber:

"(1–2) La Constitución garantiza a toda persona acusada de un delito un juicio imparcial ante un jurado sin prejuicio, y es la ley establecida en esta jurisdicción que una moción de traslado va dirigida a la sana discreción del tribunal sentenciador, y a menos que se demuestre un abuso de esta facultad, su resolución no será alterada. State v. Spotted Hawk, 22 Mont. 33; 55 Pac. 1026, y casos allí citados. No se acompañaron extractos de los periódicos a las declaraciones juradas, y los autos nada dicen en cuanto al contenido de los artículos. La manifestación aislada de que el relato del crimen había sido publicado en los periódicos y leído generalmente por los habitantes del país, y que por lo tanto el acusado sería privado de su derecho constitucional a un juicio imparcial ante un jurado sin prejuicio, es una conclusión de plano y fué correctamente desatendida por la corte sentenciadora. State v. Spotted Hawk, *supra;* Territory v. Manton, 8 Mont. 95, 19 Pac. 387. No aparece de las declaraciones juradas o de la prueba testifical hecho alguno que se dirija a la discreción judicial, excepto las manifestaciones de que se había hablado de linchar al acusado, y su efecto en la mente popular.

"Debe tenerse en cuenta que aunque el acusado había sido arrestado por un *posse comitatus armado,* y en una época en que el sentimiento era intenso, la inviolabilidad de su persona fué observada, y de acuerdo con el alto concepto de respeto a la justicia se permitió que la ley siguiera su curso, sin estorbo o impedimento. Naturalmente, cuando se ha cometido un crimen brutal, hay muchas personas cuyas lenguas desenfrenadas se rinden a la emoción, pero de ello no se infiere que el juicio de la comunidad sea uno de prevención. Los autos no demuestran el examen *voir dire* de los jurados, pero es bastante decir que cuando se obtiene un jurado en un caso de homicidio después de examinar sólo a 56 hombres, y no hay aparente circunstancia alguna inusitada, la manifestación de prejuicio y la imposibilidad de obtener un jurado justo e imparcial caen por su base. La demostración es absolutamente insuficiente para permitir

a esta corte alterar la resolución de la corte inferior denegando la moción.

" 'El juez sentenciador está generalmente familiarizado con la situación local; él conoce el sentimiento que prevalece entre la gente, en tanto en cuanto el mismo es expresado repetidamente; él conoce todos los hechos y circunstancias propios para ser considerados en la resolución del asunto; él puede que conozca a las personas que han hecho declaraciones juradas sugiriendo una excitación o prejuicio indebidos, y puede correctamente apreciar el peso que ha de darse a tales declaraciones juradas. No debe intervenirse con una discreción judicial ejercitada en tales circunstancias, a menos que su abuso sea tan claramente manifiesto que exija una revocación.' State v. Welty, 65 Wash. 244, 118 Pac. 9."

Además, como indica el fiscal y dijimos en el caso de *El Pueblo* v. *Fajardo,* 23 D.P.R. 885, la corte o el acusado pueden adicionar las declaraciones juradas mediante prueba testifical, dando a la otra parte una oportunidad de repreguntar. Cuando se presentan meros hechos que exponen principalmente las conclusiones de los testigos y no se ofrecen hechos tangibles, la corte está justificada en negarse a conceder el traslado y, en apelación, como ya se ha indicado, puede suponerse que la corte tenía alguna idea de propio conocimiento del valor de las declaraciones juradas.

También aparece de algunas de las autoridades que hemos examinado que debe hacerse una demostración de prejuicio actual. No es bastante con que una vez existió prejuicio, pues frecuentemente éste se calma antes de la época del juicio. El suceso tuvo lugar en diciembre de 1920. El juicio se celebró en diciembre de 1921. Aunque las declaraciones juradas fueron tomadas en 1921, el examen de repreguntas podría haber revelado que los deponentes no habían hecho ninguna nueva investigación reciente. Además, estas declaraciones juradas fueron aparentemente preparadas por, y positivamente juradas ante el abogado del acusado.

Como mera cuestión de derecho, quizás un abogado tiene derecho a tomar declaraciones juradas de esta naturaleza,

pero es una práctica que hemos deplorado. Las declaraciones juradas, como hemos visto, son todas de la misma clase y- son literalmente iguales. Las declaraciones juradas preparadas en esta forma tienen ciertas carencias de espontaneidad. Cuáles fueran los hechos que permitieran a los deponentes, que vivían en pueblos no contiguos como Hatillo, Moca y San Sebastián, por ejemplo, llegar exactamente a las mismas conclusiones, parece ofrecer motivo de conjeturas.

Lo principal que ha de considerarse, según nos parece, es si el acusado tuvo de hecho un juicio justo e imparcial. Hemos examinado cuidadosamente los autos y no encontramos demostración alguna de que algún jurado fuera recusado o excusado por motivo de prejuicio contra el acusado ni que éste agotara sus recusaciones perentorias. Ninguna demostración se hizo, con excepción de una sola declaración jurada presentada con una moción de nuevo juicio, que más adelante consideraremos, de que el acusado fué juzgado por doce hombres ninguno de los cuales tenía prejuicio contra él. Debe tenerse en cuenta también que creemos que la prueba fué suficiente para haber declarado culpable al acusado de un delito de asesinato en primer grado, y el jurado, como hemos visto, lo declaró culpable de homicidio voluntario.

En la vista de este caso algo se dijo de que el fiscal del distrito de Aguadilla consentía en el traslado, pero es evidente que la responsabilidad hacia el público en cuanto a esto la tiene el juez y no el fiscal. Es el juez el responsable al público con respecto al lugar en que se debe juzgar el delito. En la vista, sin embargo, el fiscal compareció y se opuso al traslado.

El próximo señalamiento de error se refiere a la forma en que fué elegido el jurado, si hubo un número suficiente de jurados presentes' o si la corte tenía derecho a excusar ciertos jurados, pero hemos resuelto consideraciones como ésta en el caso de *El Pueblo* v. *Gracia,* 31 D.P.R. 910, y no

vemos que exista ningún error perjudicial en la selección del jurado.

Otro punto en que el apelante insiste fuertemente es que la corte erró al permitir al jurado inspeccionar la escena del crimen sin estar acompañado, ya de la corte o del acusado. Para poder formar una idea justa de por qué esta inspección tiene importancia, sería conveniente examinar la prueba sucintamente, un deber con el cual el apelante no ha cumplido satisfactoriamente. Varios testigos declararon que ellos vieron al acusado y al interfecto en una lucha que trajo por consecuencia la herida y muerte subsiguiente del segundo. Todos estos testigos dicen también que ellos vieron el arma en las manos del acusado y que él luego disparó varios tiros con ella. Hubo prueba tendente a demostrar que el acusado cayó al suelo gritando "Ay mi mujer y mis chiquitos, que me han matado." La mayor parte de la prueba testifical tendió a acreditar que los disparos fueron hechos mientras los dos hombres estaban de pie, pero cierta parte de dicha prueba tendió a mostrar que se hicieron disparos mientras Gómez se caía, o posteriormente. La teoría de la defensa fué que en el encuentro con el interfecto el acusado no tenía pistola alguna pero que en la lucha el interfecto fué herido de bala y que el acusado subsiguientemente tomó y se llevó la pistola que pertenecía al interfecto. Cuando el acusado llegó a su casa en compañía de otro testigo, él sacó una pistola de una gaveta para demostrar que su propia pistola no había sido usada. Si fué un hecho, según indicaría la conclusión general del jurado, que el acusado a corta distancia disparó e hirió al interfecto, entonces desde luego que él debió haber tenido otra pistola y la posesión de otra pistola y el relato que subsiguientemente hizo darían a este acto de disparar todos los indicios de deliberación y premeditación. Naturalmente que como el acusado sostiene que él no disparó y sólo fué convicto de homicidio voluntario, la cuestión de deliberación o premeditación no juega ningún

papel importante al considerar los alegados errores de la corte inferior, pero mencionamos esto por cualquier relación que pudiera tener en cuanto a la necesidad de una inspección y en cuanto a otros aspectos del caso. Cierto testigo llamado Morell declaró que él estaba en su habitación, que se iba a acostar, cuando oyó el jadeo de dos hombres en lucha. El atravesó la habitación y se asomó a la ventana y vió a los dos hombres en lucha y declaró que Collazo tenía una pistola. La distancia inicial en que él estaba del sitio de los disparos al tiempo en que él dijo había oído el jadeo de los dos hombres, era de unos quince metros. Su testimonio fué impugnado en el examen de repreguntas y de otra manera. Varios peritos del acusado, médicos que estaban habilitados como expertos en acústica, declararon que el jadeo de dos hombres en lucha no podía oírse a tal distancia. Un perito del gobierno dijo, y creemos que muy juiciosamente, que la posibilidad de oir el jadeo podía depender de la condición de la atmósfera, las condiciones de la casa y la fuerza del jadeo. Es evidente a nuestro entender que los peritos en acústica que presentó el acusado y que declararon que el jadeo no podía oirse a una distancia de quince metros, eran cuando menos, extremadamente inexpertos. Es una cuestión de experiencia ordinaria que el jadeo puede oírse a 45 pies de distancia, dependiendo de las condiciones concurrentes. Esto no significa que este testigo particular oyó o pudo haber oído el jadeo en aquellas circunstancias, pero sabemos que allí existía esa posibilidad física. El interrogatorio sobre la cuestión de si este jadeo podía oirse a una distancia de quince metros fué bastante extenso tanto en el interrogatorio directo como en la repregunta de los peritos. Nos parece que se dió mayor importancia a esta cuestión de lo que merecía, porque es muy posible que el testigo estuviera equivocado cuando dijo que había oído el jadeo antes de llegar a la ventana, pero era fácilmente posible que pudiera oir el forcejeo de los pies de los dos hombres trabados en una lucha, u otra cosa, y que

pudiera oir el jadeo cuando vino a la ventana. El que el testigo se equivocara o no en este punto de su declaración no es cuestión que debiera afectar seriamente el valor probatorio de su declaración a los ojos del jurado. El fiscal sugirió en cierto punto de la declaración que quizá sería conveniente que el jurado hiciera una inspección ocular del lugar del suceso y por tanto al terminarse la prueba oral la corte preguntó al jurado si deseaba hacer una inspección del sitio. La contestación que dió el jurado fué que si el acusado estaba dispuesto a admitir que el jadeo de los dos hombres en lucha podía oirse a quince metros de distancia, no necesitaba ir al sitio, pero que de lo contrario iría a verlo. El acusado no estuvo dispuesto a admitir que hubiera tal posibilidad y fué ordenada la inspección ocular. Nos parece que, sin que ello significara abuso alguno de discreción ni tampoco tuviera gran relación en el caso, la corte pudo haberse negado a permitir la inspección ocular. La corte envió al jurado acompañado de varios funcionarios de la corte y le instruyó que no discutiera nada mientras estuviera fuera. El acusado no hizo objeción alguna al acto de no acompañar la corte al jurado, ni hizo moción alguna para acompañar al jurado, ni tampoco hizo objeción por dejar la corte de ordenar o permitir al acusado ir con el jurado.

Las autoridades que cita el apelante: *People* v. *Bush,* 68 Cal. 623, 10 Pac. 169; *People* v. *Milner,* 122 Cal. 172, 184, al efecto de que el acusado o el juez debió haber acompañado al jurado, son casos en los cuales el acusado hizo alguna objeción o reserva en la corte inferior. Hubo un caso que no se ha considerado enteramente, en el cual no consta si fué o no formulada alguna objeción. *People* v. *Yut Ling,* 74 Cal. 569. Por otra parte, el fiscal nos cita autoridades al efecto de que la omisión en reservar tal objeción o excepción equivale a una renuncia al derecho de tener presente al juez o al acusado. *People* v. *White,* 5 Cal. App. 329, 90 Pac. 471; *People* v. *Bonney,* 19 Cal. 427.

Véase también la nota al caso de *Scott* v. *State,* 122 A.S.R. 727. Estamos inclinados a convenir con el fiscal, además, en que como el único objeto era determinar. una sola cosa, a saber, la posibilidad de que el testigo pudiera haber oído a una distancia de quince metros, que esta inspección permitida no era verdaderamente una continuación del juicio, y que el acusado, a falta de objeción, no fué privado de derecho alguno constitucional a estar presente en todos los momentos del juicio. Es claro para nosotros que este derecho, sea cual fuere, puede renunciarse, y el apelante no ha citado autoridad alguna en contrario.

El cuarto error es como sigue:

"Cuarto.—Haber resuelto la corte que el perito médico Dr. Seín podía declarar sobre la distancia a que pudo hacerse el disparo y la naturaleza del arma que se disparaba, estableciendo una teoría sobre la posición en que estaría la persona agredida al recibir la herida y la posición del agresor con respecto a la misma."

El Dr. Seín declaró que él era médico y cirujano; que asistió al interfecto antes de morir, examinó las heridas y practicó la autopsia en el cuerpo del interfecto. El doctor refirió el examen y operación que hizo y la trayectoría de la bala, y manifestó que la herida producida por la bala fué la causa de la muerte. Declaró entonces que los orificios de la herida estaban limpios y que la pólvora no había producido quemaduras. El fiscal entonces preguntó al testigo si podía precisar la distancia a que se encontraba el revólver que produjo la muerte. El acusado se opuso por el fundamento de que el testigo era un doctor y no un testigo ocular. Que la distancia a que fué disparado el tiro era una simple cuestión de hecho que debía probarse por testigos presenciales y no por peritos médicos, y porque el asunto era una cuestión de la incumbencia del jurado. Debe notarse que no hubo objeción entonces de que el Dr. Seín no estaba suficientemente capacitado como perito. El fiscal dijo que un médico podía declarar de conformidad con el cono-

cimiento que tenía y la corte convino en esto aunque la declaración podía caer dentro de la esfera de las cosas humanas.

La teoría del acusado fué, como hemos indicado, que el interfecto inició el ataque y que después de su encuentro preliminar los dos hombres entablaron una lucha y en esa lucha el acusado había asido una mano del interfecto, como consecuencia de lo cual el revólver de dicho interfecto se volvió sobre él. También hubo prueba por parte del acusado tendente a demostrar que él no tenía ningún revólver. Por tanto, la distancia de la boca del revólver al punto de contacto de la bala con el interfecto era una cuestión importante en controversia en el caso.

La regla general es que si el jurado pudo hacer cierta inferencia de los hechos, no es necesario ninguna prueba pericial y debe ser excluída. Los casos que más adelante citaremos prueban de modo evidente que la distancia a que estaba el revólver, como fué juzgada por la apariencia de la herida, no es generalmente cuestión que está dentro del conocimiento corriente de los jurados. Que los peritos pueden declarar en vista de la apariencia de las heridas en cuanto a la distancia entre la boca del revólver y el primer contacto de la bala con el cuerpo, queda demostrado por las siguientes autoridades: *State* v. *Asbell* (Kansas), 46 Pac. 770, donde se resolvió que un testigo competente puede declarar respecto a si una herida fué producida por un disparo próximo, o uno hecho a distancia. Este caso, entre otros, fué citado con aprobación por la Corte Suprema de Pennsylvania, *Commonwealth* v. *Santos,* 119 A. 600. Allí el testigo estaba algo dudoso en su declaración y una vez manifestó que la boca del arma debió haber estado a 16 pulgadas de distancia y otra por lo menos a dos pies de distancia. A pesar de la incertidumbre de la declaración, la corte no tuvo duda alguna del derecho de un perito a declarar sobre la distancia, desde luego, teniendo en cuenta la apariencia de las heridas. Otras autoridades son *State* v. *Johns,* 132 N.

W. 835; *Boyd* v. *State*, 82 Tenn. 172, 173; *Phillips* v. *State*
(Ala.), 54 South. 112; *People* v. *Hawes*, 98 Cal. 648, 33
Pàc. 791, donde la corte indicó que el asunto era adecuado
para la prueba pericial y no podía ser clasificado con aque-
llos particulares que fueron discutidos en el caso de *People*
v. *Smith,* 93 Cal. 445, por ejemplo, la posición de dos perso-
nas, *Bearden* v. *State* (Texas), 73 S. W. 17, donde el tes-
tigo declaró en cuanto al efecto de un disparo de arma de
fuego a diferentes distancias. Wharton's Criminal Evi-
dence, Edición 10, Párrafo 770.

En este caso el Dr. Seín manifestó entonces que la dis-
tancia no podía ser menor de cuatro pies. El fiscal entonces
preguntó, "¿En qué se funda usted al hacer esa afirma-
ción?" El testigo dijo, o comenzó a decir, "Porque el dis-
paro de arma de fuego, cuando no está a una distancia ma-
yor de cuatro pies y sobre todo en armas de pequeño cali-
bre"—después de lo cual el acusado se opuso a que se si-
guiera el interrogatorio sobre este extremo, pues no se
probó que el testigo tuviera conocimiento de la balística.
La corte desestimó la objeción y el testigo declaró al efecto
de que los disparos a cortas distancias arrastraban partí-
culas de pólvora y manchaban los bordes de là herida. El
punto principal en que se insiste en esta corte es que el Dr.
Seín no acreditó ser un testigo competente en el manejo y
efecto de armas de fuego. Antes de que se hiciera tal ob-
jeción el testigo había declarado, sin la debida objeción, por
el fundamento de no estar suficientemente capacitado, y ha-
bía dicho que la herida de tal modo producida fué por una
pistola a una distancia de más de cuatro pies. Esto puede
haber sido un concepto erróneo o una equivocación, y por
lo menos otro testigo declaró en sentido contrario. La de-
claración subsiguiente del Dr. Seín, hecha después de la ob-
jeción, estaba claramente dentro de la experiencia de cual-
quier médico con alguna larga práctica o quizás sin ninguna
práctica larga. Esto es, que los disparos cercanos produ-

cían marcas de pólvora, quemaduras, y que los disparos a distancia no las producían. Antes de declarar en cuanto a una distancia definida el doctor debió haber probado su experiencia en armas de fuego pero se le permitió declarar sobre la apariencia de la herida y la distancia, sin la debida objeción, y no se hizo ninguna moción de eliminación. Por lo menos un perito médico del acusado prestó una declaración semejante sin haber acreditado debidamente su capacidad. Además, estamos convencidos de que en Puerto Rico la instrucción de un médico comprende el conocimiento de la balística. En general, cuando un acusado en un caso criminal deja de formular objeción a su debido tiempo, pero lo hace luego, si la prueba admitida tenía una tendencia perjudicial, podríamos permitir que la objeción tuviera efecto retroactivo. Este es un procedimiento dudoso cuando el acusado no hace ninguna moción para eliminar, especialmente porque el jurado hubiera oído la declaración. No alteraremos, sin embargo, el orden debido para permitir al apelante que formule una objeción cuando estamos convencidos de que el testigo, de haber sido necesario, pudo haber acreditado su capacidad si se le hubiera hecho una pregunta, especialmente cuando la resolución de la corte inferior fué que la instrucción de un médico en Puerto Rico envuelve el conocimiento de la balística y no se ha demostrado que esta resolución sea errónea.

Aún más, la cuestión de si un perito es lo suficientemente capaz es cuestión que pertenece a la discreción de la corte. La mayor parte de los médicos de larga práctica tienen bastante experiencia en esta materia. Veamos lo que dice Wigmore sobre el asunto en general, tomo 1, Segunda Edición, párrafo 561:

"Hasta dónde precisamente alcanza esto en cada jurisdicción, es difícil decirlo. En algunas, el pronunciamiento no es revisable en absoluto. En otras lo es bajo ciertas condiciones; en otras la cuestión queda confiada 'grandemente' a la discreción de la corte. Pero

el lenguaje del principio varía en diferentes opiniones; y en la práctica las resoluciones de la corte inferior constantemente son reconsideradas por la superior so pretexto de determinar si se ha 'abusado' de la 'discreción'. Pero la reforma del futuro hallará en este principio el núcleo de una extensión benéfica de la doctrina sobre discreción judicial (ante par. 16). Teniendo en cuenta la complicación de hechos que a menudo intervienen en la competencia de un testigo y que son mejor entendidos por el juez sentenciador solamente,—considerando la naturaleza relativamente insignificante (en relación con todas las cuestiones planteadas en un juicio) de los tópicos sobre los cuales gira la controversia,—observando la amplia y segura salvaguardia del examen de repreguntas para revelar las verdaderas condiciones del testigo, —tomando en cuenta la injusticia de exigir a los ocupados jueces de las cortes supremas que investiguen tales nimiedades,— en vista de todas estas consideraciones no puede dudarse que la regla del futuro debe ser: *las condiciones de experiencia de un testigo en particular son determinadas invariablemente por el juez sentenciador y no serán revisadas en apelación.*"

El acusado pudo haber repreguntado al Dr. Seín y demostrado que estaba equivocado. El podría haber probado que la ropa del acusado hubiera podido impedir, si no las quemaduras, por lo menos las marcas de pólvora y otras cosas que pudo hacer para debilitar o hacer inofensiva la declaración del Dr. Seín. El ciertamente presentó otra declaración para contradecir al perito.

El cuarto señalamiento que estamos considerando es complejo en su forma y muy poco satisfactorio. Envuelve varias objeciones. Los señalamientos deben ser solos y específicos y como en el alegato se discute principalmente la suficiencia del Dr. Seín como perito, el acusado no tendría verdadero motivo de queja si no prestamos a este señalamiento mayor atención. Se queja el apelante también de que el Dr. Seín, no obstante la objeción, declaró con respecto a la posición relativa de los dos hombres. En relación con esto, la Corte Suprema de Pennsylvania resume la jurisprudencia en esta forma:

"(p) Hay una divergencia de criterio entre las autoridades respecto a si en un juicio por asesinato la prueba de opinión que trata

dc la distancia recorrida por una bala que mató al interfecto, la dirección de donde vino y la posición del cuerpo de la víctima, al recibir el balazo, puede o no ser presentada como prueba. Algunas cortes han resuelto que tales pruebas son inadmisibles (citándose casos). Otras cortes permiten a un médico que ha examinado la herida dar su opinión respecto a la dirección de donde el golpe o bala se originó, pero no en cuanto a la posición probable de las partes (citándose casos). El peso de las autoridades parece ser que el médico que practica el examen, que ha cualificado como perito, puede emitir su parecer tanto en cuanto a la dirección y distancia del disparo, como sobre la posición de las partes (sobre dirección, véase a Hopt v. Utah, 120 U. S. 430, 7 Sup. Ct. 614, 30 L. Ed. 708, y los casos de New York & Ohio que acaban de citarse; sobre la distancia, véase a State v. Asbell, 57 Kan. 398, 409, 46 Pac. 770; Boyd v. State, 82 Tenn. (14 Lea) 161, 169, 173; Preeper v. The Queen, 15 Can. Sup. Ct. Rep. 401; en cuanto a la posición del cuerpo, véase Com. v. Dorr, 216 Mass. 314, 317, 103 N. W. 902; Wharton sobre Homicidio (3a. Ed.) par. 609, y casos allí citados. Acerca de todos los tres puntos, véase 12 Am. & Eng. Enc. of Law (2a. Ed.) pág. 449; pero aún aquellas cortes que consideran las pruebas de esta naturaleza admisibles reconocen que es de la incumbencia del jurado el determinar qué peso ha de dársele a tal prueba de opinión (véase las autoridades últimamente citadas), lo cual, por supuesto, debe ser el caso.''

Asumiendo, no obstante, que la posición de los dos hombres era cosa que estaba dentro de la incumbencia del jurado y fuera del alcance de la prueba pericial, el doctor Seín no dijo nada que fuera una cuestión controvertida en este caso. El manifestó en efecto que los dos hombres estaban de pie al hacerse los disparos, uno de ellos algo inclinado. Casi todos los testigos presenciales, y el acusado mismo, convinieron en que los dos hombres estaban de pie. Como hemos visto, la teoría del acusado era que la herida fué ocasionada mientras los dos hombres se encontraban en una lucha y la declaración del Dr. Seín en cuanto a la posición de los hombres no contradijo esa teoría. En el caso de *Territory* v. *Wells* (Oklahoma), 78 Pac. 124, la corte se expresó en estos términos:

''Si bien existen algunas autoridades que sostienen que bajo nin-

guna circunstancia prueba pericial será admitida en cuanto a la posición del cuerpo del interfecto en el momento de haber sido causada la herida, ni tampoco sobre la posición de la persona que la causa, siendo esto considerado como cuestiones acerca de las cuales los jurados son competentes para formar opiniones independientes, y que un perito médico no puede formar mejor opinión o conclusión de los hechos que como pueden hacerlo los jurados mismos, hay otros casos en los cuales las opiniones de peritos han sido recibidas en relación con tales materias. Am. & Eng. Enc. of Law (2a. Ed.), tomo 12, p. 449, y casos citados. Pero si existe error no podemos ver cómo pudo éste haber perjudicado al acusado. El fué el único testigo en el homicidio, admitió el disparo, y su declaración sobre la posición y actitud del interfecto al momento en que disparó el tiro fatal en manera alguna está en conflicto con la opinión del doctor. No hay nada en su opinión que sea inconsistente con la prueba del acusado o teoría de la defensa. Por tanto, no hubo ninguna cuestión litigiosa respecto a la cual la prueba admitida hubiera podido ejercer ninguna influencia perjudicial en el jurado. Dicha prueba manifiestamente no perjudicaba y, si hubo error, éste no proporcionaría ningún fundamento para la revocación. People v. Lemperle, (Cal.) 29 Pac. 709; People v. Hill, (Cal.) 48 Pac. 711."

La tendencia moderna es no considerar los errores que no afectan a los derechos substanciales de las partes. En el caso de *El Pueblo* v. *Alvarez,* 21 D.P.R. 86, citamos a ese efecto el artículo 362 del Código de Enjuiciamiento Criminal y la ley de mayo 30, 1904, a saber:

"Artículo 362.—Después de celebrada la vista de la apelación, la Corte Suprema debe dictar sentencia sin parar mientes en los errores o defectos técnicos o de forma, o en excepciones que no afecten los derechos sustanciales de las partes."

"Artículo 1.—(Ley de mayo 30, 1904.) Siempre que resultare de los autos en alguna causa criminal apelada a la Corte Suprema, que cualquier requisito legal haya sido desatendido por el tribunal sentenciador, no se anulará la sentencia a menos que el error que de los autos resultare, tendiere a perjudicar los derechos de cualquiera de las partes, y se hubiere interpuesto la debida excepción en el tribunal sentenciador; *Disponiéndose, sin embargo,* que el tribunal de apelación podrá conocer de errores fundamentales que aparecieren en los autos, aún cuando no se hubiere interpuesto objeción a ellos, y

fallar sobre los mismos con arreglo al derecho que de los hechos se desprendiere.''

También llamamos la atención a las decisiones de Oklahoma y Texas. Montana con sólo el equivalente del artículo 362 resolvió en el caso de *State* v. *Byrd,* 41 Mont. 586, no revocar por un error que no es perjudicial y decidió que con arreglo a tal artículo no seguiría existente la regla de que el perjuicio se presume. Véase también el caso de *People* v. *Fealy,* 33 Cal. App. 618, y casos; 17 Corpus Juris, 317 y siguientes.

Con respecto a los señalamientos de error desde el seis hasta el catorce, estamos de acuerdo con el fiscal y la cita que hace de Wharton on Homicide, tercera edición, página 914, al efecto de que cuando el ''corpus delicti'' se ha probado y las circunstancias indican que el acusado fué quien perpetró el homicidio, los hechos que tienden aun remotamente a demostrar un móvil son admisibles. Por tanto, la declaración de Antonia Gómez, que declaró que ella era la madre del interfecto y hermana del acusado, era admisible para demostrar el estado de las relaciones de familia y la mala voluntad que se alegó tenía el acusado hacia el interfecto.

También se queja algo el acusado de las instrucciones. Un error específico es que la corte, al hablar de los varios grados del delito de los cuales el acusado pudo ser convicto, nada dijo entonces sobre una absolución. Sin embargo, las instrucciones en conjunto imponían el deber al jurado de absolver en caso de una duda razonable perfectamente clara. Semejantes consideraciones son aplicables a otros comentarios sobre las instrucciones. Las instrucciones fueron correctas e imparciales y no encontramos justificación para algunas de las críticas que del juez hizo el apelante al discutir la negativa de la moción de traslado.

También presentó el apelante una moción de nuevo jui-

cio cuya desestimación se asignó como error. No existía ninguna apelación contra la resolución declarando sin lugar la moción, pero como fué presentada antes de la sentencia asumiremos el derecho a considerarla. La mayor parte de las cuestiones planteadas en esta moción han sido resueltas en la consideración que hemos hecho de los otros señalamientos. En un suplemento, sin embargo, a la moción de nuevo juicio se alegó que había habido pasión, prejuicio o parcialidad en el juicio toda vez que cierto jurado había hecho manifestaciones públicas de que el acusado era culpable. A esta moción suplementaria se le adicionó el siguiente *affidavit:*

"Yo, Agustín E. Font, mayor de edad, casado, abogado y vecino de Ponce, bajo juramento declaro:

"Que conozco personalmente a Urbino Vargas desde hace muchos años; que allá por uno de los días de julio del año 1921, hablando con dicho Urbino Vargas en el pueblo de San Sebastián sobre el caso de José Collazo Bracero y Antonio Gómez, él me dijo que la muerte de Gómez no tenía justificación y que en su opinión Collazo había obrado imprudentemente. (Fdo.) Agustín E. Font."

Si bien el apelante señaló como error la desestimación de la moción de nuevo juicio, al argumentar este señalamiento no se hizo ninguna referencia al *affidavit* de Font. Sólo se hace mención del mismo exclusivamente al discutir la omisión de la corte a ordenar un traslado. En la moción de nuevo juicio la falta de la corte en ordenar un traslado no se asigna como error. También mientras la corte resolvía la moción de nuevo juicio en una razonada opinión no se hizo mención alguna de este *affidavit* y probablemente no fué considerado por la corte inferior y quedó abandonado en apelación excepto al discutirse la referida moción de traslado. Sin embargo, el fiscal discutió el *affidavit* y le daremos alguna consideración.

No se pretendió transcribir el interrogatorio del jurado

Urbino Vargas en el juicio. Debe presumirse que en su interrogatorio bajo juramento él manifestó que no tenía una opinión formada, o algo como esto. Con arreglo al artículo 227, par. 7, del Código de Enjuiciamiento Criminal la opinión formada por los periódicos, rumores y otras cosas semejantes no incapacitarán a un testigo y no existe nada en el *affidavit* de Font que demuestre cómo fué formada la opinión de Vargas. La presunción, pues, quedaría de que él no estaba incapacitado.

En el caso de *Territory* v. *Emilio,* 89 Pac. 242, New México, opinión que fué cuidadosamente considerada, citada por el fiscal, la corte en un caso semejante dijo que en tanto la moción se refería a la incapacidad de un jurado iba dirigida a la sana discreción legal de la corte sentenciadora. Estamos convencidos también de que la desestimación de la moción era asunto dentro de la sana discreción de la corte sentenciadora y no se demostró ningún abuso. En general, cuando se ha alegado la formación de una opinión como incapacidad, la objeción se hizo en el momento en que el jurado estaba presente y así fué levantada en apelación. *People* v. *Wills,* 100 Cal. 459, y citas. Después del juicio la demostración tiene que ser fuerte.

Los demás errores son cuestiones relativas a la discreción de la corte al permitir supuestas preguntas sugestivas y a otros particulares sobre admisión o denegación de prueba, que no creemos sean erróneos, o, de serlo, ellos claramente no eran perjudiciales. Así es que no los discutiremos.

La prueba que hemos revisado sucintamente demostró que hubo suficiente prueba para justificar al jurado en emitir un veredicto de homicidio voluntario, y más bien creemos que se debió a la habilidad de los abogados del acusado que éste se salvara de una condena por el delito más grave.

*La sentencia apelada debe ser confirmada.*

El Juez Asociado Señor Hutchison disintió.